**CONTRACT MATERIALS PROCESSING, INC.,**
Plaintiff

v.

**KATALEUNA GMBH CATALYSTS,**
Defendant

**No. CIV. AMD 98–147.**

United States District Court,
D. Maryland.

Aug. 25, 2003.

See also 164 F.Supp.2d 520.

Joseph S. Lyons, Neil Jay Brafman, Law Office of Joseph S. Lyons, Towson, MD, Paul S. Richter, Richter, Miller and Finn, Richard Harold Gins, Gins and Greenfeld PC, Washington, DC, for Plaintiff.

Barbara Susan Wahl, Evan Scott Stolove, Arent, Fox, Kintner, Plotkin and Kahn PLLC, Washington, DC, for Defendants.

Barbara Susan Wahl, Evan Scott Stolove, Arent, Fox, Kintner, Plotkin and Kahn PLLC, Benjamin Sorrells Boyd, Piper Rudnick LLP, Brian E. Ferguson, McDermott, Will and Emery, Washington, DC, Alice A. Brown, Exxon Mobil Corporation, Houston, TX, John J. Woloszyn, pro se, Baltimore, MD, for Movants.

Barbara Susan Wahl, Evan Scott Stolove, Randall A. Brater, Arent, Fox, Kintner, Plotkin and Kahn PLLC, Washington, DC, for Counter Claimants.

Joseph S. Lyons, Law Office of Joseph S. Lyons, Towson, MD, Paul S. Richter, Richter, Miller and Finn, Washington, DC, for Counter Defendants.

## MEMORANDUM OPINION SETTING FORTH FINDINGS OF FACT and CONCLUSIONS OF LAW

DAVIS, District Judge.

In this diversity action, plaintiff/counterclaim-defendant, Contract Materials Processing, Inc. ("CMP"), alleged in its amended complaint, *inter alia*, claims for breach of contract, conversion, and misappropriation of trade secrets in connection with three related agreements, a "Technology Transfer Agreement" ("TTA"), "Sales Agency Agreement" ("SSA"), and a "Research Development Agreement" ("RDA"). CMP sought damages exceeding $7 million from defendant/counterclaim-plaintiff, KataLeuna GmbH Catalysts ("KataLeuna") and other entities.[1] With respect to the TTA, CMP alleged that KataLeuna had misappropriated certain unidentified trade secrets that were embodied in technology that was transferred from CMP to KataLeuna pursuant to the TTA. KataLeuna denied liability and subsequently alleged several counterclaims. It is one of those counterclaims that is adjudicated in this opinion.

Although CMP properly requested a jury trial as to all issues properly to be tried before a jury, for reasons fully stated on the record over the course of several hearings, I concluded that KataLeuna's counterclaim for rescission of the TTA was an equitable claim not subject to jury trial, and that the recision claim could be tried with no adverse impact upon CMP's right to a jury trial as to its claims for breach of the SSA and RDA. Accordingly, I bifurcated the counterclaim for purposes of trial.[2] I conducted a 13–day bench trial beginning on February 10, 2003, and concluding on July 17, 2003.

In seeking the equitable remedy of recision, KataLeuna alleged that CMP had breached the TTA and was unjustly enriched because the technology transferred under the agreement was demonstrably ineffective and/or unpatentable because

---

**1.** On September 18, 2001, I dismissed all claims against two other defendants, Tricat Management GmbH ("Tricat") and Tricat Catalytic Products ("TCP"). *See Contracts Materials Processing, Inc. v. KataLeuna GmbH Catalysts*, 164 F.Supp.2d 520, 537–38 (D.Md. 2001) (granting in substantial part defendants' motion for summary judgment and thereby dismissing CMP's claims for breach of the TTA, conversion, and misappropriation of trade secrets).

**2.** *See* Transcript of Motion Hearings held on January 14, 2003, and January 24, 2003 (discussing at length possible bifurcation).

the technology was not new and unobvious. KataLeuna sought restitution in an amount exceeding $3 million. For the reasons discussed herein, I find and conclude that, because CMP knowingly and/or recklessly misrepresented material facts surrounding the likely effectiveness of the technologies that were transferred to KataLeuna pursuant to the TTA, and because CMP specifically breached contractual warranties that were critical to KataLeuna's execution of the TTA in the first instance, recision is wholly warranted and is an appropriate remedy.

## I. Background

A brief recitation of the factual context in which the dispute surrounding KataLeuna's counterclaim for recision arises will frame the issues for decision; a full statement of the procedural history of the case is contained in two earlier opinions. *See Contracts Materials Processing, Inc. v. KataLeuna GmbH Catalysts,* 164 F.Supp.2d 520 (D.Md.2001)(granting in part and denying in part cross-motions for summary judgment); *Contract Materials Processing, Inc. v. Kataleuna GmbH Catalysts,* 222 F.Supp.2d 733 (D.Md.2002)(interlocutory award of attorney's fees to KataLeuna).

CMP is a Maryland corporation providing services to the chemical industry. In particular, it has expertise in the manufacture of additives and catalysts that aid in refining petroleum. KataLeuna is a German corporation that is also involved in the chemical industry. From 1995 until January 1997, Dr. P. Kenerick Maher ("Maher") was the Chairman of KataLeuna. During that time, 25.2% of KataLeuna was owned by an arm of the German government, the BvS, and 74.8% of KataLeuna was owned by defendant Tricat. Defendant Tricat, previously dismissed from this action, is a German corporation, a holding company, that was managed by Maher

during the period relevant to this dispute. Tricat is a wholly owned subsidiary of Tricat Industries, Inc. ("TII"), an American corporation. As of January 1, 1997, Tricat divested itself of all its interest in KataLeuna. TCP, another German corporation, is a wholly owned subsidiary of defendant Tricat. It was formed approximately at the same time that Tricat ceased to hold any interest in KataLeuna. Maher is the managing director of TCP.

In October 1995, pursuant to the TTA, CMP transferred its entire right, title and interest in certain technology to defendant KataLeuna pursuant to the TTA. *See infra* findings 58–61. The TTA provides as follows in part:

> [CMP] is the owner of, or has rights to, the Technology .... [CMP] desires to sell and [KataLeuna] desires to buy the Technology upon the terms and conditions hereinafter described .... Subject to the terms and conditions of this Agreement, [CMP] shall sell, assign, convey and transfer to [KataLeuna] [CMP's] entire right, title and interest in and to the Technology, including without limitation the right to make, use and sell the same anywhere in the world ....

*Kat. Exh. 80* at 1, 5. Thus, through the TTA, CMP transferred to KataLeuna CMP's entire FCC additives business and related intellectual property, including but not limited to patent applications that CMP had filed, CMP's business plan relating to the FCC additives business, customer information, testing procedures, and manufacturing processes. In exchange, CMP received 5,000 shares of Tricat Industries, Inc.'s stock, $1.9 million at closing, and a supplemental payment of up to $7.6 million. *See infra* findings 63–66. The supplemental payment component was to be calculated based upon the gross margin generated by KataLeuna and its subsidiaries' FCC additives business.

The gist of the parties' dispute is whether the technology transferred to KataLeuna comported with certain warranties attested to by CMP in the TTA and whether, more generally, the technology otherwise had genuine economic value. What is clear, both explicitly and implicitly as a theme running throughout the parties' dealings and the progress of this case, is that KataLeuna elected to protect itself in this multi-million dollar deal by undertaking a level of "due diligence" well below what would otherwise have been expected, and elected to rely instead on express and implied warranties and guaranties provided by CMP itself. Manifestly, it was CMP's highly risky decision to provide such warranties, in the form of affirmations to KataLeuna under the penalties of perjury (by virtue of CMP's agreement that representations made to the United States Patent and Trademark Office within relevant patent applications should be deemed to have been made to KataLeuna directly). Thus, as disclosed by the within findings and conclusions, CMP, fully represented by independent counsel, made warranties and representations as to critical terms of the TTA that were profoundly ill-advised under the circumstances.

In any event, in January 1998, CMP initiated this action in a pre-emptive fashion. In its complaint, CMP alleged various breach of contract claims, demanding damages in excess of $7 million. Defendants moved to dismiss the case; on October 5, 1998, treating that motion as a motion to quash service, I granted the motion and required CMP to comply with the Hague Convention in effecting service on the German entities. Thereafter, on December 9, 1998, CMP filed its amended complaint. The amended complaint alleged, among other things, claims for misappropriation and conversion. In due course, further preliminary motions were filed. In ruling on Tricat's motion to dismiss for lack of personal jurisdiction and on all defendants' motion to dismiss certain counts of the amended complaint, I concluded as a matter of law that "[i]t is undisputed that, pursuant to the [T]echnology [T]ransfer [A]greement, CMP assigned all of its right, title and interest in the subject matter of the technology to KataLeuna. Accordingly, [CMP] had no legitimate right to possess [the Technology] ∴... Moreover, CMP's argument that it possesses an equitable security interest is unavailing." August 11, 1999, Memorandum Opinion at 14. Nevertheless, although I dismissed the claims for conversion, I reasoned that "[i]n light of the liberal spirit pervading the pleading requirements under the Federal Rules of Civil Procedure," the misappropriation claims would remain in the case. *Id.* at 12.

A long and highly contentious period of discovery then ensued. After the close of discovery, in an opinion filed on September 18, 2001, I entered summary judgment in favor of defendants as to CMP's misappropriation claims. Specifically, I reasoned as follows, in pertinent part:

> Here, CMP argues that KataLeuna, TCP and Tricat have misappropriated CMP's trade secrets, namely the Technology. However, CMP has failed to generate any evidence demonstrating that the Technology qualifies as a trade secret under the Act. Nor has CMP provided any detail or description of what it claims to be trade secrets. Without sufficient detail, I am unable to determine whether specific technology concerns trade secrets. Although it was not necessary for CMP to disclose all of the details of its trade secrets, it had to do more than merely note that the Technology involved trade secrets. [*Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655, 661 (4th Cir.1993) ]. Without such evidence, no reasonable jury could find

that the Technology was not generally known or readily ascertainable by proper means. Nor could a reasonable jury conclude that the Technology derives independent economic value from its secrecy.

Defendants further argue that the CMP's misappropriation claims fail because CMP chose not to keep the Technology a secret, thus failing the second element of a trade secret. [MD. CODE ANN., COM. LAW II § 11–1201(e)(2) (2002) (The Maryland Uniform Trade Secrets Act)]. Under the Act, a misappropriation occurs when one acquires secret information by improper means or discloses the secret information without express or implied consent by a person who used improper means to acquire the information. § 11–1201(c). Again, CMP utterly fails to meet its burden to demonstrate that it took any steps to maintain the secrecy of the Technology. None of the agreements restrict KataLeuna from disclosing the information. In fact, the R & D Agreement only requires CMP, the research organization, to maintain secrecy and confidentiality. No similar restriction is placed on KataLeuna. Because CMP has failed to demonstrate that CMP took any reasonable steps to ensure the secrecy of the technology, CMP cannot claim this information as trade secrets under the Act.

In addition, not only has CMP failed to demonstrate that it took reasonable steps to maintain the secrecy of the technology, CMP has also failed to establish that any defendant misappropriated the Technology. Proving misappropriation of secret information would require CMP to show that defendants used improper means to acquire from CMP information currently in the defendants' possession or that the information was improperly disclosed to others. *See*

§ 11–1201(b). The entirety of CMP's misappropriation claim hinges upon its allegation that KataLeuna transferred the Technology to Tricat and TCP. Completely absent, however, is any evidence that the alleged transfer was improper. The record clearly shows that CMP voluntarily transferred its "entire right, title and interest in and to the Technology, including without limitation the right to make, use and sell the same anywhere in the world …." Technology Transfer Agreement at § 3. Thus, I shall grant defendants' motion for summary judgment on counts V, VIII and XII of the Amended Complaint.

*Contracts Materials Processing, Inc.*, 164 F.Supp.2d at 533–35 (footnotes omitted).

Subsequently, defendants filed, and I granted, a motion for an award of attorney's fees. *Contract Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 222 F.Supp.2d 733 (D.Md.2002). After determining that the remaining claims should be bifurcated, *see supra* n. 2, I conducted a bench trial on KataLeuna's counterclaim for recision. My findings of fact and conclusions of law are set forth herein.

## II. Findings of Fact

A. Background of Corporate Entities (Findings 1–12)

B. Fluid Catalytic Cracking Process (Findings 13–51)

i. Fluid Catalytic Cracking Operating Procedures (25–33)

ii. FCC Additive: SOx Emissions Control Additives (34–41)

iii. FCC Additive: Combustion Promoter (42–49)

iv. FCC Additive: Octane Enhancers (50–51)

C. Technology Transfer Agreement (Findings 52–316)

i. Unambiguous Provisions and Implementation Thereof (52–71)

ii. TTA Representations and Warranties (72)

iii. The Inventive Process Leading to the SOx A Patent Application (73–87)

• Testing by the Research Triangle Institute (88–126)

• CMP's Knowledge (Regarding SOx A) Prior to Execution of the TTA (127–135)

• Expert Opinion that CMP's Zinc Titanate SOx Emissions Control Additive Technology (SOx A) Is Not Effective to Reduce Sulfur Emissions (136–150)

• SOx Effectiveness (and alternative Hydrotalcite SOx formula) (151–172)

iv. The Inventive Process Leading to the Combustion Promoter B Patent Application (173–188)

• Early Commercial Trials of Combustion Promoter B (189–221)

• Commercial Trial of Combustion Promoter B at Mobil Oil (222–257)

• Akzo Testing of Combustion Promoter B (258–271)

• Expert Analysis of Combustion Promoter B (272–307)

• Effectiveness of Combustion Promoter B (308–316)

D. Patent Prosecution Histories (Findings 317–417)

i. The SOx A Patent Application (326–352)

ii. The Combustion Promoter B Patent Application (353–369)

iii. The Octane Enhancer Application Patent Application (370–398)

iv. Hydrotalcite Patents and Technology (399–410)

E. History of KataLeuna and the Technologies after Execution of the TTA (Findings 411–417)

F. Rescission (Findings 418–443)

### A. Background of Corporate Entities

1. KataLeuna is a German company located in Leuna, Germany. *Tr.* at 438.[3]

2. KataLeuna has been engaged in the research, development, production, and sale of certain types of catalysts for many years. *Id.*

3. On February 10, 2003, KataLeuna was not registered to do business in Maryland. *Tr.* at 1 0–13.

4. Tricat Industries, Inc. ("TII") is an Oklahoma corporation having its principal place of business in Maryland.[4] *CMP*

---

**3.** All references herein to the bench trial transcript are noted as "Tr." I conducted the 13 day bench trial on February 10–13, 2003, March 5–6, 2003, March 17–18, 2003, and April 21–24, 2003. Closing arguments were held on July 17, 2003.

**4.** In my earlier opinion, I concluded that KataLeuna, not a separate Tricat entity, has standing and is the proper party to seek recision of the TTA. *See Contracts Materials Processing, Inc.,* 164 F.Supp.2d at 529 (discussing at length CMP's assertions that KataLeuna is not the "real party in interest"); *see also* Transcript of Motion Hearing held on August 29, 2000, at 45–52; Order dated August 30, 2000 (denying CMP's motion to dismiss all counterclaims brought by KataLeuna); Order dated October 16, 2000 (denying CMP's motion for reconsideration). Although the relationship between the numerous Tricat entities (TII, Tricat, TCP, Triadd, and the German BvS, discussed *infra* findings 411–417) and KataLeuna changed between 1995–1998 (the period when both parties were operating under the TTA), KataLeuna and the Tricat entities are essentially "one entity" for purposes of the factual situations described herein. CMP has argued extensively that, because KataLeuna and Tricat signed an agreement that KataLeuna would transfer all technology under the TTA to Tricat for $10.2 million as of January 1997, *see infra* findings 411–417, it is inac-

*Exhibits* ("CMP Exh.") *103* (McDaniel Employment Agreement), *207* (P.K. Maher letter to Dr. Meyer).

5. TII was formed by Dr. P. Kenerick Maher ("Maher") in 1992. *CMP Exh. 45* (1998 TII Business Plan).

6. Dr. Edwin Albers ("Dr. Albers") formed CMP in 1987. *Tr.* at 291, 296–97.

7. Dr. Albers received a B.S. in physical chemistry from Clarkson University in 1952 and a Ph.D. in physical chemistry from Rensselaer Polytechnic Institute in 1961. *Tr.* at 292–93.

8. CMP is a Maryland corporation with its principal place of business in Baltimore. *Tr.* at 290.

9. CMP has been engaged for more than 15 years in providing highly specialized services to the chemical and petrochemical industries on a worldwide basis, including certain types of additives, catalysts, technical consulting, research and development services, analytical services, new process and product development, and technical sales. *CMP Exh. 41* (Cativco Business Plan); *Tr.* at 31–32; 43–44.

10. In September 1993, J. Gary McDaniel ("McDaniel"), a professional acquaintance of Dr. Albers, became CMP's Vice President of Sales and Marketing on a part-time basis. *Tr.* at 31–32.

11. While employed by CMP, McDaniel played a significant role in the further development of CMP's FCC additives technologies and CMP's comprehensive business plan relating to CMP's FCC additives business. *Tr.* at 43–58.

12. At all times relevant to this case, Dr. Albers has been CMP's president and sole shareholder. *Tr.* at 291–92.

**B. Fluid Catalytic Cracking Process**

13. In the early 1990s, CMP became interested in fluid catalytic cracking ("FCC") additives and the FCC additives business. *Tr.* at 34–44.

14. By 1992, CMP asserts, it had accumulated a significant amount of market information and developed several new and unique technologies relating to FCC additives and the FCC additive business. *CMP Exhs. 41, 42* (Advantage Additive Business Plan); *Tr.* at 1376–77.

15. Fluid catalytic cracking is a process involved in oil refining where heavy gas oil products are converted into lighter end, more valuable products like gasoline, diesel fuel, and jet fuel. *Tr.* at 34–35 (McDaniel).

16. The fluid catalytic cracking process typically takes place in large FCC units. *Tr.* at 35; *KataLeuna Exhibit* ("Kat. Exh.") *330* (Diagram).

17. An FCC unit is comprised of "two separate vessels." *Tr.* at 35–36; *Kat. Exh. 330.*

18. One vessel is called the "reactor" and the other vessel is called the "regenerator." *Id.*

19. An FCC unit uses a catalyst to break the heavy gas oils into the lighter products. *Id.*

20. The catalyst actually cracks the gas oils into smaller pieces. *Id.*

21. FCC catalysts are chemical compounds that cause a chemical reaction to occur, but are not themselves changed (or

curate to refer to "KataLeuna" in relation to the FCC additives business after January 1997. I disagree, and find that both Tricat and the BvS (regardless of their specific legal relationship) have agreed to be bound by

my rulings with regard to KataLeuna's counterclaim for recision and by the final judgment entered in this case. *See* Transcript of Motion Hearing held on August 29, 2000, at 45–52; Order dated August 30, 2000.

consumed) by the chemical reaction. *Tr.* at. 37; *Zeller Tr.* at 5.

22. FCC catalysts are utilized, among other things, in connection with the refinement of petroleum. *Tr.* at 36–37.

23. FCC additives are often utilized in an FCC unit to maximize the efficiency, productivity, and effectiveness of the fluid cracking catalysts in the overall refining process. *Tr.* at 37–42.

24. Common functions of FCC additives (including combustion promoters, SOx additives, and octane enhancers-discussed *infra*) are to promote the combustion of carbon monoxide to carbon dioxide in the "dense phase" of the regenerator, to assist in capturing and controlling/reducing SOx emissions, and to increase octane levels. *Id.*

### i. Fluid Catalytic Cracking Operating Procedures

25. The FCC unit utilizes a combination of heat, gases (e.g., hydrogen and oxygen), and catalysts to cause the cracking of certain molecular bonds to increase the yield of high quality oil products. *Tr.* at 34–38.

26. The FCC process starts with crude oil that comes into the refinery and initially goes through several "minor processes" during which various contaminates such as salt, are removed or "broken out" through distillation; a gas oil byproduct remains. *Tr.* at 36–37; *Kat. Exh. 330.*

27. The gas oil byproduct from distillation is then fed into the FCC unit through the oil feed. *Id.*

28. A hot FCC catalyst is fed into the reactor from the regenerator and meets the gas oil feedstock. *Id.*

29. When the gas oil and the catalyst make contact in the reactor, the reactions break the big molecules into smaller molecules that are then fed to other parts of the refinery. *Id.*

30. As a result of the chemical reactions in the reactor of the FCC unit, the catalyst becomes "coked up" and is black because it is covered with carbon deposits. *Id.*

31. In order to continue using the catalyst in subsequent reactions in the reactor, the carbon must be removed. *Id.*

32. The catalyst is, thus, filtered from the FCC reactor back into the regenerator, where the carbon is burned off with a current of air and the catalyst is heated. *Id.*

33. The catalyst circulates through the regenerator where it is cleaned and then recycled back into the reactor. *Id.*

### ii. FCC Additive: SOx Emissions Control Additives

34. The gas oil that is introduced into the FCC unit also contains sulfur compounds. *Tr.* at 39.

35. When the gas oil reacts with the catalyst in the reactor, these sulfur compounds deposit on the catalyst along with the carbon. *Tr.* at 40–41.

36. As the catalyst is recycled through the regenerator, the oxygen added to the FCC unit promotes the conversion of the sulfur compounds into sulfur dioxide ($SO_2$) and sulfur trioxide ($SO_3$). *Id.*

37. If the resulting $SO_2$ and $SO_3$ are released into the atmosphere through the flue of the regenerator, it can lead to acid rain. *Id.*

38. To mitigate the release of sulfur oxide (SOx) into the atmosphere, oil refineries may employ various strategies, including the use of SOx emission control additives. *Id.*

39. SOx additives promote the conversion of $SO_2$ to $SO_3$ in the regenerator

and then capture or "pick up" the SO3 using a metal oxide. *Id.*

40.   The SO3 thus becomes attached to the SOx additive itself and is recycled back into the reactor. *Id.*

41.   In the reactor, the SO3 is reduced to hydrogen sulfide (H2S), which is ultimately converted into other sulfur products, thereby preventing SO2 from entering the atmosphere through the flue of the regenerator. *Id.*

### iii.   FCC Additive:  Combustion Promoter

42.   The introduction of oxygen and the presence of heat in the regenerator leads to the creation of carbon monoxide (partial combustion) and then carbon dioxide (full combustion). *Tr.* at 38; *Kat. Exh. 330.*

43.   This reaction of carbon monoxide and carbon dioxide generates significant heat and thus increases the temperature in the regenerator. *Id.*

44.   Since the temperature in an average regenerator runs extremely hot, between 1100 and 1400 degrees, maintaining control over the temperature in the regenerator is paramount. *Tr.* at 38–39, 375.

45.   The bed of catalyst at the bottom portion of the regenerator, or "dense phase," serves as a heat sink and absorbs the heat from the reaction of carbon monoxide to carbon dioxide. *Tr.* at 38–39; *Kat. Exh. 330.*

46.   In order to help control the temperature in the regenerator, it is advantageous to have the full combustion of carbon to carbon monoxide to carbon dioxide take place in the lower portion of the regenerator (dense phase) as opposed to the upper portion of the regenerator (dilute phase). *Tr.* at 37–39; *Kat. Exh. 330.*

47.   If the combustion of carbon monoxide to carbon dioxide takes place in the dilute phase, the temperature in the regenerator rises rapidly, often called "afterburn," which can cause problems with the structural integrity of the FCC unit itself. *Tr.* at 39.

48.   The hardware of the FCC unit can actually start to melt if the FCC regenerator achieves a "hot enough temperature." *Id.*

49.   Many oil refineries utilize an FCC additive called a combustion promoter to speed the combustion process in the FCC unit regenerator and to ensure that full combustion takes place in the dense phase of the regenerator. *Tr.* at 38–39.

### iv.   FCC Additive:  Octane Enhancers

50.   FCC unit operators also utilize octane enhancement additives. *Tr.* at 41–42.

51.   Octane enhancement additives react with the gas oil in the reactor of the FCC unit and cause certain reactions so that the resulting gasoline product will have a higher octane level. *Tr.* at 42.

### C.   Technology Transfer Agreement

### i.   Unambiguous Provisions and the Implementation Thereof

52.   In 1995, the German government privatized state-owned businesses, including several businesses that became Kata-Leuna. *Tr.* at 70, 106, 1228–29.

53.   In 1997, Triadd (specializing in FCC additives business) was an operating division of KataLeuna. *Tr.* at 106.

54.   At this same time, KataLeuna was owned by a company called Tricat Management GmbH ("Tricat") which was owned by Tricat Industries ("TII"). *Id.*

55.   In connection with this privatization effort, KataLeuna made several capital investments in technology. *Id.*

56.   In September 1995, CMP executed and delivered into escrow the written

Technology Transfer Agreement ("TTA") pending acceptance of the same by Kata-Leuna. *Tr.* at 82.

57. On or about October 27, 1995, KataLeuna executed the TTA. *Kat. Exh. 80.*

58. Under the TTA, KataLeuna (Buyer) purchased from CMP (Seller)

> the *inventions* and *all intellectual property,* composition of matter and use, and process technology (whether or not patentable) and all documentation, test reports, summaries, compilations, statistical analysis, reports, notes, memoranda, writings and *all other intellectual property rights and personal property* which embodies such intellectual property with respect to [the following]:
>
> (a) two sulfur oxide pollution control additives identified as SOx A and SOx B;
>
> (b) U.S. Patent Application: "Catalyst Composition and Methods for Using and Preparing Same" ("SOx A Patent Application") filed on September 5, 1995;
>
> (c) a CO-combustion promoter identified as Combustion Promoter B;
>
> (d) U.S. Patent Application: "Catalyst and Process for Preparing Same" ("Promoter B Patent Application") filed on May 2, 1995;
>
> (e) an octane enhancement additive identified as Octane B;
>
> (f) U.S. Patent Application: "Catalyst and Application for Same" ("Octane B Patent Application") filed on September 12, 1995; and
>
> (g) the Thiele Technology.

*Tr.* at 74–76; *Kat Exh. 80,* ¶¶ 1(n), 2(a), 3, 6 and 18 (emphasis added).

59. Dr. Albers testified that the "SOx B" additive in the TTA "was non zinc titanate type materials," and could be "zinc titanate, with talc, which is high [magnesium] oxide content, and HTC, hydrotalcite[,] . . . [or] a clay based upon chloride clay" or "whatever other combinations of inorganic oxides [CMP] could come up with to make a viable material." *Tr.* at 1449–51.

60. SOx B, however, is not specifically defined under the TTA except as "similar to SOx A but *under further development." Kat. Exh. 80* at ¶ 1(n)(5) (emphasis added).

61. SOx B's specific chemical composition is not defined in the TTA and no evidence was presented at trial that SOx B had a specific chemical combination or was more than just the subject of a research interest. *Tr.* at 75–76, 232–35.

62. No evidence was presented at trial to establish that SOx B became a commercially viable technology for purposes of the TTA. *Id.*

63. Under the TTA, KataLeuna was also granted a

> right of first refusal with respect to . . . all of [CMP's] rights now existing or hereafter created including any patents to make, use and sell any and all:
>
> (a) sulfur oxide pollution control;
>
> (b) CO-combustion promoter; and
>
> (c) octane enhancement fluid cracking catalyst additives

without any additional consideration to Seller [CMP] or either Inventor [Dr. Albers and McDaniel] . . . . *Kat. Exh. 80,* ¶ 18(b).

64. In exchange for the "Technology" encompassed in the TTA, KataLeuna:

> (a) paid $1,900,000 to CMP at closing;
>
> (b) placed with an escrow agent an additional $600,000, of which CMP subsequently received $200,000;

(c) transferred to CMP 5,000 shares of Tricat Industries, Inc. (TII) stock with an agreed value of $75,000; and (d) agreed to make supplemental payments to CMP based on gross margin from future sales beginning in the fourth quarter of 1997, until total payments to CMP reached a specified cap of $9,500,000.

*Kat. Exh. 80, ¶ 2(b) and (c); Tr.* at 84–85.

65. On October 27, 1995, in connection with the transfer of the Technology under the TTA, CMP, Dr. Albers, McDaniel, and Harry Burkhead (a CMP employee) executed and delivered to KataLeuna three documents, entitled "Assignment of Patent Application," for U.S. Patent Application Serial Nos. 08/526,976 (Octane B Patent Application), 08/523,434 (SOx A Patent Application), and 08/432,996 (Promoter B Patent Application). *Kat. Exhs. 74–76* (Applications).

66. In 1995, as part of the overall transaction associated with the TTA, McDaniel left CMP and went to work for TII. *Tr.* at 33.

67. At the time McDaniel left CMP to work for TII, KataLeuna was a subsidiary of TII. *Tr.* at 106.

68. Pursuant to his employment contract with TII, McDaniel was assigned to run KataLeuna's Triadd FCC Additives division ("Triadd")—which handled KataLeuna's fluid catalytic cracking (FCC) business. *Tr.* at 33; *CMP Exh. 103,* ¶ 2 (McDaniel Employment Agreement).

69. From September or October 1995 until March 1997, McDaniel was the president of Triadd (KataLeuna's FCC additives business division). *Tr.* at 33, 84–85.

70. From March 1997 until the second quarter of 1998, McDaniel was the president and chief executive officer of TII. *Tr.* at 33.

71. McDaniel has been the vice president of TII and in charge of the Tricat zeolites business since 1998. *Tr.* at 34.

### ii. TTA Representations and Warranties

72. Under the TTA, CMP made numerous representations and warranties concerning the FCC additives technology it sold to KataLeuna, including that:

(a) "all statements and oaths made in the CMP Patent Applications shall be deemed to have been made to [KataLeuna] and [KataLeuna] shall be entitled to rely upon them as if made directly to [KataLeuna]," *Kat. Exh. 80,* ¶ 4(b)(6); *Tr.* at 76–78;

(b) "[t]o the best of [CMP's] knowledge, all information contained in the CMP Patent Applications is true, complete and correct and contains no errors or omissions as filed," *Kat. Exh. 80,* ¶ 4(b)(6); *Tr.* at 76;

(c) CMP had not "disclosed any part of the Technology to third parties and the Technology remains secret in all respects, whether or not such disclosure would or could adversely affect [CMP's] right to obtain a patent therefor, except pursuant to confidentiality agreements," *Kat. Exh. 80,* ¶ 4(b)(10); *Tr.* at 78; and

(d) "[t]o the best of its knowledge, the Technology is new, useful and unobvious," *Kat. Exh. 80,* ¶ 4(b)(13); *Tr.* at 78.

### iii. The Inventive Process Leading to the SOx A Patent Application

73. Under the TTA, SOx A is defined as a zinc titanate based sulfur oxide pollution control additive, "which removes sulfur from fluid catalytic cracking unit emissions." *Tr.* at 75; *Kat. Exh. 80,* ¶ 1(n)(4); *Kat. Exh. 86* at 3 (Patent Application).

74. The industry standard SOx emissions control additive is sold under the trade name DeSOx. *Tr.* at 44.

75. DeSOx is a magnesium aluminate spinel material that has "some very complex processing steps" and is very expensive to manufacture. *Tr.* at 45.

76. In addition to the cost of manufacture, the sales price of DeSOx is further increased because royalties must be paid to certain licensors. *Id.*

77. In 1994, CMP set out to invent a new type of SOx emissions control additive to compete with DeSOx because CMP believed that there was an opportunity to create a low cost material comprised of non-spinel zinc titanate. *Tr.* at 44–45.

78. CMP filed a patent application for the SOx A additive on September 5, 1995, and it was assigned Serial No. 08/523,434. *Tr.* at 59; *see Kat. Exh. 86.*

79. The SOx A patent application was assigned to KataLeuna. *Kat. Exh. 75.*

80. Under the TTA, KataLeuna was "entitled to rely" on all statements contained in the SOx A patent application as representations made by CMP directly to KataLeuna. *See Kat. Exh. 80,* ¶ 4(b)(6).

81. In the section of the SOx A patent application entitled, "Detailed Description of the Invention," CMP represented that: "[t]he invention uses the catalyst composition in a process to reduce the emissions of sulfur compounds from industrial processing needs such as fluid cracking catalyst (FCC) process used in petroleum refineries and the coal gasification processes used by utility companies." *Kat. Exh. 86* at 3; *Tr.* at 60.

82. Coal gasification is a process used generally in power plants but not in connection with FCC units. *Tr.* at 60.

83. In the section of the SOx A patent application entitled, "Detailed Descrip-

tion of the Invention," CMP also represented that "[t]his invention is also the use of a catalyst composition to reduce the emissions of sulfur compounds from industrial processes." *Kat. Exh. 86* at 7; *Tr.* at 61.

84. The section of the SOx A patent application entitled, "Summary of the Invention," states that the invention "includes a process for reducing the amount of SOx emissions passing through a fluid particle bed" and "a process for preparing a catalyst for the removal of SOx." *Kat. Exh. 86* at 2–3; *Tr.* at 62.

85. In the section of the SOx A patent application entitled, "Detailed Description of the Invention," CMP further represented that

> [t]he fluid cracking catalyst additive of this invention reduces the amount of SOx emissions from a fluid catalytic cracking unit by "capturing" the SOx in the fluid cracking catalyst regenerator section and "releasing" the captured sulfur as H2S in the stripper/reactor sections of the fluid cracking catalyst unit. The additive promotes the oxidation of SOx to SO3 in the fluid cracking catalyst regenerator, captures this SO3 in the fluid cracking catalyst regenerator by forming an inorganic sulfate, and reduces this inorganic sulfate in the fluid cracking catalyst stripper/reactor to H2S. This H2S is later removed downstream. In the preferred embodiment of this invention, the zinc titanate component provides the functionality of SOx capture and H2S release.

*Kat. Exh. 86* at 8; *Tr.* at 61–62.

86. This process is described in claim 26 of the SOx A patent application. *Kat. Exh. 86* at 18; *Tr.* at 63.

87. Other claims of the SOx patent application also pertained to the use of the

invention in ebullating beds for power plants (coal gasification) and other non-FCC uses. *See, e.g., Kat. Exh. 86* at 18 (claim 28); *Tr.* at 61–63.

### ● *Testing by the Research Triangle Institute*

88. Dr. Raghubir Gupta has been the research director at the Research Triangle Institute in North Carolina ("RTI") for 13 years. *Tr.* at 475.[5]

89. Dr. Gupta has a Ph.D. in chemical engineering and specializes in gas oxide reactions with material sorbents and catalysts. *Id.*

90. Dr. Gupta has six issued patents and three patents pending, including patents related to zinc titanate. *Tr.* at 476, 487–88.

91. In 1986, RTI began working on developing a "zinc titanate as a sorbent material for removing sulfur and compounds from gas." *Tr.* at 477.

92. By 1992, Dr. Gupta and his colleague, Santosh Gangwal had developed a zinc titanate sorbent that was suitable for use in a fluidized-bed reactor for removing reduced sulfur species, particularly $H_2S$, in the coal gasification process ("RTI's zinc titanate sorbent technology"). *Tr.* at 504–07.

93. In 1992, RTI filed a patent application disclosing their zinc titanate sorbent technology and were issued U.S. Patent 5,254,516 for this technology in 1993. *Kat. Exh. 302* (Patent).

94. Subsequently in the early 1990s, RTI published a number of technical papers (including *"Hot Coal Gas Desulfurization in Fluidized–Bed Reactors Using Zinc Titanate Sorbents"*) also disclosing RTI's zinc titanate sorbent technology.

*Id.; CMP. Exh. 297* (Paper); *Tr.* 501–02, 506–07.

95. In 1994, Dr. Gupta, on behalf of RTI, was working under a contract with the United States Department of Energy ("DOE") that involved researching and developing sorbent materials to remove power plant gases. *Tr.* at 476.

96. As part of the research and development of sorbent materials to remove power plant gases with the DOE, RTI subcontracted with CMP to manufacture (produce not develop) a zinc titanate catalyst. *Tr.* at 476, 481; *Kat. Exh. 316–18* (Invoices), 319 (Confirmation Letter).

97. As part of the 1994 contract, CMP agreed to toll manufacture 3000 kg of the zinc titanate sorbent technology disclosed in U.S. Patent No. 5,254,518 for RTI. *Tr.* at 1439–46; *Kat. Exh. 319.*

98. Dr. Albers and CMP subsequently advised RTI that CMP had proprietary technology that would enable CMP to provide a fluid material for commercialization of RTI's zinc titanate sorbent technology. *Tr.* at 476–79, 1439–42; *CMP Exh. 297.*

99. CMP and RTI executed a Confidential Disclosure Agreement in connection with the DOE subcontract dated July 6, 1993, whereby both parties agreed to maintain all proprietary information of the other party in confidence. *Tr.* 498–99, 1444; *CMP Exh. 286.*

100. In October 1994, Dr. Gupta and RTI filed a patent application for the use of zinc titanate as a sulfur removal additive in the coal gasification process in power plants. *Tr.* at 487–88; *Kat. Exh. 302.*

101. During the course of the work on the DOE subcontract for Dr. Gupta and RTI, Dr. Albers and CMP expressed a

---

**5.** CMP's counsel made an extraordinarily inappropriate attempt during trial to intimidate Dr. Gupta into declining to testify. My con-

demnations of counsel's actions are expressed on the record.

belief that the zinc titanate material that they were producing for RTI also could be utilized in FCC units. *Tr.* at 477–78 (Gupta).

102. As a result, in 1994, CMP requested that Dr. Gupta assess the capacity of the zinc titanate material to work as a SOx emission control additive in an FCC unit by testing it in a thermo-gravametric analysis ("TGA") machine at RTI. *Tr.* at 478–79.

103. Although CMP asserts that CMP disclosed the SOx A technology (CMP–5) to RTI and Dr. Gupta for TGA testing (analyzing the zinc titanate formula for use in FCC units) pursuant to a confidentiality agreement that was separate from the agreement between the parties in connection with the DOE project, I find that no separate confidentiality agreement existed. *Tr.* at 299–300, 303, 482–83, 498; *CMP Exh. 286.*

104. The TGA tests performed by RTI and Dr. Gupta were outside the scope of the DOE subcontract, and, thus, were not covered under the confidentiality agreement between CMP and RTI signed in connection with the DOE subcontract. *Tr.* at 299, 303, 482–83; *CMP Exh. 286.*

105. The TGA tests are designed to measure the pickup of SO2 by the zinc titanate under controlled conditions. *Tr.* at 46, 479.

106. At Dr. Albers's request, Dr. Gupta ran a series of TGA tests (monitoring SO2 "pickup") on the CMP zinc titanate material, which was usually identified as "CMP–5" on the graphs that RTI provided. *Tr.* at 478–87; *Kat. Exhs. 81–84* (Graphs), *248.*

107. CMP–5 (and later the SOx A additive sold to KataLeuna under the TTA for use in FCC units) was actually the same zinc titanate material being developed by RTI for use in power plants under the DOE project. *Tr.* at 476, 481 (Gupta), 303–04 (Dr. Albers).

108. In the TGA tests, RTI compared the ability of the CMP–5 zinc titanate material to pick up and release sulfur oxide with the ability of the other zinc titanate preparations and the commercially available DeSOx to do the same. *Tr.* at 478–87; *Kat. Exhs. 81–84* (Graph Results), *248.*

109. On or about June 15, 1994, Dr. Gupta sent Dr. Albers a fax with the first results of the TGA tests RTI had run on the samples of CMP's zinc titanate Sox A additive. *Tr.* at 306–07, 480; *Kat. Exh. 248.*

110. Subsequently, Dr. Gupta discussed this data on the telephone with Dr. Albers and told him that the "zinc titanate itself was not very suitable for DeSox application." *Tr.* at 480.

111. On or about July 6, 1994, Dr. Gupta sent a letter to Dr. Albers with the TGA test results of three additional zinc titanate samples. *Tr.* at 481; *Kat. Exh. 81.*

112. One of these three samples was identified as CMP–5. *Tr.* at 309–311; 481–82.

113. The other two samples provided by CMP for the second set of tests were: (1) CMP–5 and one part oxidation catalyst; and (2) CMP–5 and two parts oxidation catalyst. *Tr.* at 482.

114. In his letter to Dr. Albers (describing the results of the second set of tests), Dr. Gupta observed "that the CMP–5 which [RTI] tested had very little activity for removing SO2 but when [RTI] added platinum to the zinc titanate it showed some activity for removing SO2." *Tr.* at 483.

115. Dr. Gupta told Dr. Albers that zinc titanate, alone, was not effective for SOx removal. *Id.*

116. I find, as Dr. Gupta testified, that although CMP–5 showed "some activity for removing SO2" when platinum was added to the sample, this activity still was not "as good activity as the industry standard De-Sox." *Id.*

117. On or about August 16, and August 19, 1994, Dr. Gupta sent additional TGA test results to Dr. Albers of more zinc titanate-based samples. *Kat. Exhs. 82, 83.*

118. These additional TGA tests included samples of CMP–5 combined with platinum in a one-to-one ratio. *Tr.* at 484–85.

119. Dr. Gupta conveyed his opinion to Dr. Albers that the CMP–5 additive mixed with platinum (a sample labeled Catave 850) did not show much SOx pickup. *Tr.* at 484–86; *Kat. Exh. 81* at 1.

120. Finally, on or about September 2, 1994, Dr. Gupta sent Dr. Albers TGA test results that compared more samples of the CMP–5 mixed with platinum against the commercial DeSOx material. *Tr.* at 486; *Kat. Exh. 84.*

121. The data from this last test was not useful because the sample was left in the TGA unit over the weekend and picked up moisture. *Tr.* at 486.

122. Dr. Albers agreed that this test did not provide any meaningful data. *Tr.* at 315.

123. Dr. Gupta continued to believe, and I find, that zinc titanate would not work as a SOx emissions control additive. *Tr.* at 486–87.

124. Using equations and chemical reactions to support his opinion, Dr. Gupta explained to Dr. Albers (on a blackboard at CMP's offices) that zinc titanate did not work as a SOx emissions control additive. *Tr.* at 487 (Gupta).

125. The TGA testing of the SOx A emissions control additive (CMP–5) was completed more than one year before the TTA was fully executed. *Kat. Exh. 84.*

126. CMP did *no further work* on the SOx A additive (CMP–5) after the RTI testing. *Tr.* at 47–48, 303–04 (Dr. Albers).

● *CMP's Knowledge (Regarding SOx A) Prior to Execution of the TTA*

127. Prior to executing the TTA, CMP and Dr. Albers were aware that the zinc titanate formula for SOx additives (which was sold to KataLeuna under the TTA) did not effectively capture SOx and was not effective for removal of sulfur from an FCC unit. *Tr.* at 299–300 (Dr. Albers), 304, 309, 480–87; *Kat. Exhs. 248, 81, 82, 83, 84* (TGA test results performed by RTI).

128. Dr. Albers admits that the TGA tests run by RTI were "less than desirable" and demonstrated that the SOx A technology was not as effective as the commercial DeSOx. *Tr.* at 299–300, 304, 307.

129. In 1994, approximately one year before execution of the TTA, Dr. Albers and CMP knew that RTI and Dr. Gupta had filed and were prosecuting a patent application for the same zinc titanate formula as SOx A (CMP–5) for use in power plants *and* FCC units. *Tr.* at 318–20, 343; *Kat. Exh. 304* (Amendment Correcting Inventorship on the Gupta/RTI patent application); *Kat. Exh. 306* (Preliminary Amendment adding claims 11–39).

130. In October 1994, a heated dispute between Dr. Albers and RTI arose concerning whether Dr. Albers and Burkhead (a CMP employee) would sign the patent application for the zinc titanate sorbent material for use in both FCC units *and* power plants that had been prepared by RTI and its counsel. *Tr.* at 1830–33, 1835–36; *Kat. Exh. 325.*

131. Ultimately, Dr. Albers refused to sign the RTI patent application. *Tr.* at 319, 1831, 1836.

132. As a result of Dr. Albers's refusal to sign the RTI patent application, RTI (through patent counsel) filed an "Amendment Correcting Inventorship" with the United States Patent and Trademark Office ("USPTO") deleting Dr. Albers and Burkhead as inventors on Patent Application Serial No. 08/325,853 for the zinc titanate sorbent material. *Kat. Exh. 304, 305.*

133. RTI subsequently filed an "Amendment After Final Action" with the USPTO to cancel the "inventive contributions" (claims 1–16, 29–30, 34–96 in Patent Application Serial No. 08/325,853) of Dr. Albers and Burkhead. *Id.*

134. Nonetheless, CMP represented in its SOx A patent application that SOx A included an application for zinc titanate's use in power plants (referred to in the Gupta/RTI patent), specifically, "wherein flue gas or hot gas of *said coal gasification unit* is passed through said ebullating or fluidized bed." *Tr.* at 63; *Kat. Exh. 86* at 18 (emphasis added).

135. Additionally, Dr. Gupta and RTI alleged, and I find, that Dr. Albers and CMP used confidential information gained during the course of the RTI–CMP DOE subcontract (when both parties were subject to the July 1, 1993, confidentiality agreement) in their subsequent patent application (transferred to KataLeuna under the TTA) for a zinc titanate SOx removal additive. *Tr.* at 490–91; *CMP Exh. 303.*

● *Expert Opinion that CMP's Zinc Titanate SOx Emissions Control Additive Technology (SOx A) Is Not Effective to Reduce Sulfur Emissions*

136. Dr. Douglas P. Harrison is the Voorhies Professor of Chemical Engineering at Louisiana State University. *Tr.* at 511; *Kat. Exh. 259.*

137. Dr. Harrison specializes in chemical engineering, chemical reactions and high temperature gas-solid reactions, and

has published 25–30 articles and papers on that subject. *Tr.* at 512.

138. Dr. Harrison was accepted as an expert witness for KataLeuna in chemical engineering, chemical reactions, and high temperature gas-solid reactions pursuant to Fed.R.Evid. 702 without objection from CMP. *Tr.* at 513.

139. In preparing his expert report, Dr. Harrison reviewed, among other things, the zinc titanate TGA test data that had been generated by RTI for CMP, the SOx A patent application, and the patent that ultimately issued on the SOx A technology. *Tr.* at 513–14; *Kat. Exh. 259* (Harrison Report).

140. Dr. Harrison also conducted an independent thermodynamic equilibrium analysis ("TEA"), a standard scientific and mathematical evaluation process used to analyze chemical reactions, using CMP's formulation for the zinc titanate SOx A additive. *Tr.* at 516–18; *Kat. Exh. 259.*

141. Dr. Harrison explained that, while the TEA includes approximations and simplifications, the TEA is a "standard mechanism used in [this particular field of chemical engineering] for evaluating chemical reactions." *Tr.* at 517–18.

142. Specifically, the TEA "used thermodynamic principles to estimate if zinc titanate would be an effective SOx removal agent." *Tr.* at 516.

143. The TEA performed by Dr. Harrison "showed that in all probability [SOx A] would not be effective" even given the approximations and simplifications of the TEA, *Tr.* at 518, and I so find.

144. Dr. Harrison opined that concluding that the SOx A was not effective was confirmed by the RTI TGA test data which "showed that zinc titanate was quite inferior to the commercial [ (industry standard) ] DeSox," *Tr.* at 518, and I so find.

145. Using the TEA *and* the available TGA test data (from RTI), Dr. Harrison concluded that, within a reasonable degree of scientific certainty, the CMP zinc titanate SOx A additive "would not be an effective SOx removal agent," *Tr.* at 517–18; *Kat. Exh. 259,* and I so find.

146. Dr. Harrison also concluded, based on the TEA and the tests run by RTI, that the addition of platinum oxidation promoter to the zinc titanate additive *does* promote the conversion of SO2 to SO3 thereby resulting in some sulfur removal, but this removal *is well below* the effectiveness of commercial or industry standard SOx additives and is attributable to the presence of the platinum and not the zinc titanate, *Tr.* at 518, 533–34; *Kat. Exh. 259,* and I so find.

147. I reject CMP's assertions that Dr. Harrison's conclusions regarding the commercial effectiveness of the CMP zinc titanate SOx A additive are irrelevant because I find that comparison to the industry standard SOx additive is appropriate to determine the value of the SOx A technology to KataLeuna. *Id.*

148. I add that, although Dr. Harrison concluded that the SOx A additive's effectiveness was well below commercial standards for sulfur removal, he, nonetheless, stated that it would have been appropriate and helpful in preparing his expert report if he had known that CMP "took the position, quite vocally and openly, that the so-called statistical analysis performed [by RTI] was defective." *Tr.* at 529.

149. Although CMP makes reference to Dr. Bernhardt Trout's (CMP's witness tendered as an expert on, *inter alia,* TEA, basic chemical reactions, and correlations of model predictions) expert report to contradict Dr. Harrison's trial testimony concerning the effectiveness of CMP's SOx A additive, I excluded Dr. Trout as an expert on March 5, 2003, as unreliable under Fed.

R.Evid. 702, and therefore, CMP introduced no admissible testimony to contradict Dr. Harrison's conclusions, *Tr.* at 525–33, 607, 696–702, and in any event, nothing in Dr. Trout's report would alter my findings in these regards.

150. Further, contrary to CMP's assertions that there was no guarantee that the SOx technology transferred under the TTA would be as effective as the commercial or industry standard (in most cases DeSox, a platinum-based additive) SOx additive, I find that the industry standard provides the most useful benchmark against which to determine the effectiveness, utility, value, and efficacy of the SOx technology transferred under the TTA.

● *SOx Effectiveness (and alternative Hydrotalcite SOx formula)*

151. The TGA data on the zinc titanate SOx A additive and Dr. Harrison's TEA of the SOx A additive demonstrate that SOx A does not effectively (i.e., significantly below extant commercial standards) capture SOx or release H2S, and therefore, does not effectively reduce sulfur emissions from an FCC unit. *Kat. Exh. 259; Tr.* at 517–18.

152. Contrary to the representations CMP made in the TTA, the formulation for a zinc titanate SOx additive that CMP sold to KataLeuna under the TTA as SOx A, is not effective in reducing the emissions of sulfur compounds from an FCC unit. *Tr.* at 517–18; *Kat. Exh. 259; CMP Exh. 220.*

153. The TTA defines the SOx A technology (referred to both specifically by name and generally as part of the "Technology" in the TTA) as "a sulfur oxide pollution control catalyst which *removes* sulfur from fluid catalytic cracking unit emissions," *Kat. Exh. 80* at ¶ 1(n)(4) (emphasis added), and states that the "Technology *is complete* and contains all of the information necessary for Buyer to utilize

the same for the *purposes of further development into a commercial product,*" *Kat. Exh. 80* at ¶ 4(b)(11) (emphasis added).

154. I find that, although the SOx A technology transferred under the TTA may have arguably been "complete," the chemical formulation for the zinc titanate-based SOx A technology is not currently effective for SOx removal in an FCC unit and it is doubtful that "further development" by KataLeuna will increase the likelihood of commercial viability. *Tr.* at 486–87 (Gupta), 516–18; *Kat. Exh. 80* at ¶ 4(b)(11).

155. KataLeuna and CMP entered into a related agreement, also executed on October 27, 1995 (with the other two agreements the TTA and SAA), that concerned FCC additive technology—the "Research and Development Agreement" (RDA). *Kat. Exh. 79.*

156. During the course of the RDA in 1996, CMP prepared additional formulations of zinc titanate-based SOx emission control additives. *Tr.* at 312–13, 332–36.

157. Among other formulations, Dr. Albers experimented with combinations of zinc titanate and hydrotalcite. *Id.*

158. Dr. Albers claimed that "there was a synergy between zinc titanate and hydrotalcite and if you put the two together you would actually get a better SOx performance . . . ." *Tr.* at 123–24, 950.

159. Although contrary to the direction of McDaniel (under the RDA), CMP continued to research and test the effectiveness of hydrotalcite and zinc titanate in SOx removal and were eventually issued a patent for the formulations but refused to "offer" the patent to KataLeuna as required under the TTA. *Tr.* at 332–36; *CMP Exh. 327, 328.*

160. Dr. Albers testified that CMP "was interested in people who might want to pursue the [hydrotalcite] patents," but CMP had not offered the hydrotalcite patents to other clients, and, although CMP recognized KataLeuna's right of first refusal, had not offered them to KataLeuna. *Tr.* at 1814–15.

161. In 1996, CMP provided KataLeuna with data and results from TGA tests run on the various zinc titanate additive formulations it had worked up under the RDA. *Tr.* at 949–50.

162. On or about October 9, 1996, John McCauley, KataLeuna's head of research and development, prepared a memorandum for McDaniel that reviewed these tests and reached a conclusion as to the effectiveness of zinc titanate as a SOx additive. *Tr.* at 950; *CMP Exh. 220.*

163. Included in this memorandum was a statistical analysis that demonstrated that any activity in the zinc titanate/hydrotalcite samples came from hydrotalcite and "none of it comes from the zinc titanate," *Tr.* at 964–66, and I so find.

164. McCauley testified that there was a margin of error in the TGA results (that he could not exactly determine), but as far as he was concerned, "the highs and lows [ (points plotted on the graphs depicting the TGA test results for zinc titanate/hydrotalcite samples) ] were always within the range of error measurement error for the [TGA] machine." *Tr.* at 966.

165. McCauley testified at trial that, based on the TGA results that were within the margin of error, he "never saw any activity for zinc titanate, . . . [and he] was looking for it [because] . . . the whole purpose was to find this synergistic effect, no matter how small it was." *Tr.* at 966.

166. McDaniel testified that as a result of McCauley's statistical analysis, KataLeuna "came [to] a realization around October of 1996, that there wasn't anything

going on with the zinc titanate material," *Tr.* at 148, and I so find.

167. CMP produced no evidence at trial to demonstrate that it ever had a basis for concluding that zinc titanate was or could be an *effective material* for FCC SOx emission control. *Kat. Exh. 80* at ¶¶ 2(n)(4), 4(b)(11).

168. Despite assertions to the contrary CMP produced no evidence to support its theory that a "combination of zinc titanate with hydrotalcite had a synergistic effect and was particularly effective for sulfur removal in an FCC environment." *Tr.* at 148, 964–66; *CMP Proposed Findings of Fact* at 61.

169. Under the TTA, CMP did not transfer or assign to KataLeuna an effective SOx emissions control additive (SOx A) that was valuable in comparison to the extant industry standard. *See supra* findings 150, 154.

170. It is clear that, regardless of further development by KataLeuna, the chemical formulation for the zinc titanate-based SOx A technology purchased under the TTA is not effective for SOx removal in an FCC unit. *Tr.* at 486–87 (Gupta), 516–18.

171. Further, KataLeuna received nothing of value from the SOx A patent application transferred by CMP under the TTA. *See id.*

172. KataLeuna pursued and was eventually issued U.S. Patent No. 5,801,115 on September 1, 1998 (based on the SOx A additive purchased under the TTA), but the patent was "dramatically limited" and "substantially narrower" than the patent application purchased under the TTA, and required both amendments and continuation-in-part applications before the patent issued. *Tr.* at 558–59 (Steiner); *Kat. Exh. 205; see infra* findings 342, 347–50.

### iv. The Inventive Process Leading to the Combustion Promoter B Patent Application

173. Combustion Promoter B is defined under the TTA as "[a] cobalt based version of Combustion Promoter A for which a U.S. Patent Application" has been filed. *Kat. Exh. 80*, ¶ 1(n)(2).

174. Combustion Promoter A is defined as "a platinum based combustion promoter currently patented by Mobil Oil Company." *Kat. Exh. 80*, ¶ 1(b).

175. Platinum is a noble metal. *Tr.* at 48.

176. The industry standard commercial combustion promoter contains platinum that catalyzes the reaction of carbon monoxide ($CO$) to carbon dioxide ($CO2$) in the regenerator of an FCC unit. *Tr.* at 48–49.

177. Because platinum is very expensive, there are high costs involved with manufacturing a conventional platinum-based combustion promoter. *Tr.* at 48–49.

178. In addition, platinum-based combustion promoters are based on technology developed and patented by Mobil Oil. *Id.*

179. Because Mobil Oil has patented the platinum-based promoter technology, royalties must be paid in order to manufacture conventional combustion promoters. *Id.*

180. A non-noble metal based combustion promoter, therefore, would have significant cost advantages. *Id.*

181. To avoid the high cost of a noble-based promoter, CMP attempted to develop a new promoter that was not based on a noble metal such as platinum. *Tr.* at 48.

182. CMP filed a request for a patent application for Combustion Promoter B on May 2, 1995, and it was assigned Serial No. 08/432,996. *Tr.* at 63–64; *Kat. Exh. 87.*

183. This application was assigned to KataLeuna. *Kat. Exh. 74.*

184. The Combustion Promoter B patent application contained CMP's formulation of its combustion promoter utilizing the non-noble metals cobalt, strontium and lanthanum combined with other materials. *Tr.* at 63–64; *Kat. Exh. 87*, at 3–6 (Patent Application).

185. Under the TTA, KataLeuna was "entitled to rely" on all statements contained in the Combustion Promoter B patent application as representations made by CMP directly to KataLeuna. *Kat. Exh. 80*, ¶ 4(b)(6).

186. CMP represented in the Combustion Promoter B patent application that the invention is an FCC additive and process for making the same for *"promoting* the combustion of carbon monoxide to carbon dioxide in the regeneration of a fluid cracking catalyst." *Kat. Exh. 87* at 1 (emphasis added); *Tr.* at 64.

187. CMP further represented that "[t]he [Combustion Promoter B] invention is a catalyst composition and process for making the catalyst composition. The catalyst composition *promotes* the combustion of carbon monoxide to carbon dioxide .... The process is for producing a combustion promoter catalyst of carbon monoxide to carbon dioxide." *Kat. Exh. 87* at 10 (emphasis added).

188. CMP also represented that "[t]he non-noble metal [Combustion Promoter B] additive [that CMP has] discovered for catalyzing the conversion of carbon monoxide to carbon dioxide in the regenerator of an FCC unit is less expensive to produce and *results in an additive with the same efficiency as a noble metal additive* in converting the carbon monoxide into carbon dioxide ... [and] *is a very effective* 'combustion promoter' additive ...." *Kat. Exh. 87* at 2 (emphasis added); *Tr.* at 64.

● **Early Commercial Trials of Combustion Promoter B**

189. Prior to the execution of the TTA, CMP conducted two limited commercial trials of Combustion Promoter B. *Tr.* at 50; *Kat. Exh. 203*.

190. After purchasing the CMP technology under the TTA, KataLeuna marketed Combustion Promoter B under the brand name PROMAX 2000. *See, e.g., Tr.* at 358.

191. Neither commercial test was "scientific" in nature; there were no controls "in the way of an ordered, organized test" in place to see whether the Combustion Promoter B worked as against the industry standard. *Tr.* at 51, 53.

192. The first commercial test was conducted at Ultramar Refining in Halifax, Nova Scotia ("Ultramar") in February 1995. *Tr.* at 50–51, 53

193. CMP shipped Ultramar a small amount of Combustion Promoter B to put into its FCC unit. *Tr.* at 50.

194. Ultramar stopped adding its conventional platinum-based promoter and added the Combustion Promoter B over the course of several days (according to McDaniel's trial testimony, contradicting the NPRA paper, *see infra* fact no. 205, stating that the promoter was added over the course of approximately three weeks) and saw no change in the FCC unit's performance. *Tr.* at 50; *CMP Exh. 40* at Bates No. DEF 005727.

195. Another commercial test was also conducted at Consumer's Co-op in western Canada in February 1995. *Tr.* at 52.

196. This test was also of a limited duration and no change was observed in the operation of the FCC unit after the Combustion Promoter B was added. *Tr.* at 52–53; *Kat. Exh. 203*.

197. When describing the process through which Combustion Promoter B was tested, McDaniel explained that an FCC unit has a "circulating inventory of catalysts and additives." *Tr.* at 100.

198. If the oil refinery is utilizing a conventional platinum-based promoter, then there is already a baseline amount of that conventional promoter in the FCC unit. *Tr.* at 100.

199. At the beginning of a trial, the oil refinery will stop adding the conventional platinum-based promoter and begin adding the Combustion Promoter B. *Id.*

200. The changeover, however, is not instantaneous. *Id.*

201. It takes time (a matter of weeks) for the concentration of Combustion Promoter B to increase and reach saturation, and the concentration of platinum to decrease. *Tr.* at 53, 100–01; *see infra* findings 228–229.

202. Complete saturation occurs when there is no longer any conventional platinum based promoter left in the system and only Combustion Promoter B remains in the FCC unit. *Tr.* at 101.

203. Without complete saturation, it is difficult to discern whether the Combustion Promoter B is actually promoting the combustion of carbon monoxide to carbon dioxide, or if the carbon combustion is being catalyzed by residual platinum-based promoter. *Tr.* at 100.

204. The concentration of Combustion Promoter B in the FCC units during the Ultramar and Consumer's Co-op trials was never brought to complete saturation, so the results of these tests were inconclusive. *Tr.* at 52–53, 103–04.

205. Nonetheless, as no changes were observed in the operation of either FCC unit, McDaniel and CMP concluded that "it looked good so far." *Tr.* at 53.

206. The paper presented to the National Petroleum Refiners Association ("NPRA") in March 1997,[6] and authored by McDaniel and Jonah Smith (Product Manager of Triadd) documents that the two Ultramar and Consumer's Co-op trials were successful, and states that "[the trials] clearly indicat[e] that PROMAX 2000 performed as effectively as [an industry] standard platinum promoter." *CMP Exh. 40.*

207. CMP accurately asserts that, in the paper McDaniel presented to the NPRA, he makes no mention of a "lack of saturation" in the FCC units during the two trials in Ultramar and Consumer's Co-op or that the level of "saturation" could affect the overall results of the trial. *Id.*

208. McDaniel testified at trial, however, that the NPRA paper essentially represented a "sales pitch" to the industry and that he and Smith were "trying to sell [PROMAX 2000] in the market . . . .," *Tr.* at 105, and I credit this testimony.

209. With regard to the favorable conclusions he drew in the NPRA paper about the effectiveness of PROMAX 2000 (Combustion Promoter B), McDaniel stated that "when you make a sales pitch you don't say it doesn't work, you say it works." *Id.*

210. During trial, however, McDaniel testified that, although the factual information contained in the NPRA paper (the data as reported and taken from the refineries) was and is still correct and accurate, he would "draw different conclusions to-

---

**6.** The NPRA is a "national organization [for] the oil refiners and the vendors that service the oil refining industry." *Tr.* at 102. The NPRA holds an annual meeting in March and "dozens of papers . . . are presented to the forum" which includes all of the "industry people." *Id.* Vendors present papers to the industry to report their latest technological developments and "strut their stuff in front of the industry." *Id.*

day" about the effectiveness of PROMAX 2000 based on that data and subsequent "pieces of information that have come along over time that showed that the [PROMAX 2000 or Combustion Promoter B] does not work as [KataLeuna was] hoping and claiming that it would." *Tr.* at 105–06; *CMP Exh. 40.*

211. I find that McDaniel and Smith were essentially "puffing" in the NPRA paper in an attempt to make PROMAX 2000 more marketable and attractive to potential buyers in the petroleum industry. *Id.*

212. Further, I find McDaniel to be a credible trial witness and accord his trial testimony about the NPRA paper and the new conclusions he would draw today based on the two refinery trial runs and information gained since the trial runs considerable weight and consider his testimony to be reliable. *Id.*

213. In the fourth quarter of 1996, KataLeuna had a third commercial trial of Combustion Promoter B conducted at Farmland Industries in Kansas. *Tr.* at 98; *Kat. Exh. 203.*

214. Again, the concentration of the promoter was never brought to complete saturation, so the results of this test were inconclusive. *Tr.* at 100–01.

215. The results indicated that the temperature in the regenerator phase of the FCC unit maintained its normal delta range (change in temperature). *Tr.* at 98–99.

216. At the time of the third commercial trial, McDaniel believed that the Farmland test results demonstrated that the Combustion Promoter B worked. *Tr.* at 101.

217. McDaniel later documented the Farmland test results in the NPRA paper, concluding (at that time) that the results proved that the Combustion Promoter B worked effectively. *CMP Exh. 40.*

218. Farmland personnel, however, did not agree that the Combustion Promoter B effectively promoted carbon combustion. *Tr.* at 101.

219. Farmland refused to purchase PROMAX 2000 after the commercial trial because it did not believe that PROMAX 2000 was an effective combustion promoter or as effective as a noble metal based combustion promoter. *Tr.* at 101–02.

220. CMP asserts that Farmland did place a repeat order for the Combustion Promoter B additive, *see CMP Exh. 188* (Letter from McDaniel regarding prospective additive sales), but McDaniel testified at trial and I find that Farmland never *actually purchased* any subsequent PROMAX 2000. *Tr.* at 101–02.

221. Neither Consumer's Co–Op nor Ultramar placed any subsequent orders for Combustion Promoter B. *Tr.* at 132–33.

● *Commercial Trial of Combustion Promoter B at Mobil Oil*

222. Teresa Young is employed at the Chalmette, Louisiana, refinery of Exxon Mobil (which was then Mobil Oil Company ("Mobil")). *Young Tr.* at 6.[7]

223. In 1997, Young was a process engineer at Mobil's Chalmette refinery. *Young Tr.* at 8–9.

224. Young's job was to monitor the day-to-day operation of the FCC unit and the reactions to different events that occurred within the unit. *Young Tr.* at 9–10.

---

**7.** All references herein to Teresa Young's deposition testimony are noted as "Young Tr." The Young deposition was taken in New Orleans, Louisiana, on November 15, 2002.

CMP's objections to the admissibility of the Young testimony are overruled. KataLeuna's objections to CMP's questions are sustained.

225. Young was approached in 1997 by members of Tricat (previously "KataLeuna") to conduct a trial of PROMAX 2000 in the Chalmette unit. *Young Tr.* at 12; *CMP Exh. 319.*

226. PROMAX 2000 was supplied for the trial by Johnson Matthey PLC ("Johnson Matthey"). *Young Tr.* at 79; *Tr.* at 358–59, 382–83.

227. Mobil agreed to a test run because, if the new combustion promoter worked, it could save Mobil money. *Young Tr.* at 13–15.

228. Since the material was determined to be a low risk item with regard to health and environmental problems, Mobil believed that the highest risk to such a test run would be that the PROMAX 2000 would not work. *Young Tr.* at 16.

229. If the PROMAX 2000 did not work, then Mobil expected the result would be erratic temperatures in the regenerator of the FCC unit because the conversion of carbon monoxide to carbon dioxide would not occur as it should with a conventional platinum-based combustion promoter (resulting in increased temperatures in the "dense phase" of the regenerator). *Young Tr.* at 16–17.

230. In August 1997, the commercial trial of PROMAX 2000 was conducted by Mobil in its FCC unit in Chalmette, Louisiana. *Young Tr.* at 20; *Tr.* at 129–30.

231. At the time of the test, the regenerator was operating correctly. *Young Tr.* at 30.

232. Mobil purchased the PROMAX 2000 from KataLeuna for the trial. *Young Tr.* at 21; *Tr.* at 129–30.

233. Mobil stopped adding its noble-metal based promoter and began adding approximately ten pounds of the PROMAX 2000 per day into the regenerator of the FCC unit on or about August 5, 1997. *Young Tr.* at 21–23, 25.

234. Mobil determined that it might be two to three weeks before any adverse change might be observed. *Young Tr.* at 21–22.

235. After two to three weeks, Mobil "calculated that the old promoter would be at a concentration that it would be [sic] no longer be effective. The new promoter should have been at high enough concentration that it should have been controlling the CO to CO2 reaction." *Id.* at 22.

236. This was the first trial performed using KataLeuna's Combustion Promoter B (purchased from CMP under the TTA) that approached saturation in an FCC unit. *Tr.* at 133.

237. On or about August 24, 1997, almost three weeks after Mobil began adding PROMAX 2000 to its FCC unit and expected the PROMAX 2000 to approach or reach saturation in the unit, the FCC unit "started seeing unstable temperatures in the regenerator tower." *Young Tr.* at 25.

238. The operators made adjustments on the unit to compensate for this temperature increase and the changes in temperature seemed to "calm down." *Young Tr.* at 25–26.

239. However, on the next day, August 25, 1997, the temperature increases in the FCC unit "got even worse." *Young Tr.* at 27.

240. When the temperature in the regenerator increased on August 25, 1997, (before Young arrived the next morning) the FCC unit operators added a total of approximately 140 pounds of PROMAX 2000, but the temperature of the FCC unit did not decrease to the normal guideline temperatures. *Young Tr.* at 29.

241. When Young arrived at the Chalmette refinery on the morning of August 26, 1997, the console operator yelled at her that "the PROMAX [2000] didn't work, so can they please put the old stuff back in." *Young Tr.* at 28.

242. Young directed the operators to put an additional twenty pounds of PROMAX 2000 into the regenerator that morning, but the temperature continued to increase. *Young Tr.* at 28–29.

243. After the additional 20 pounds of PROMAX 2000 did not adequately decrease temperatures in the FCC unit on August 26, 1997, Ms. Young directed the operator to add 40 pounds of the old platinum-based promoter. *Young Tr.* at 29.

244. Within fifteen minutes of adding 40 pounds of the old platinum-based promoter, the temperature "started lining out" and began to drop back to its normal operating range. *Young Tr.* at 29.

245. After adding approximately 50 additional pounds of the conventional, platinum-based, promoter later in the day on August 26, 1997, the FCC operators were able to "sustain controllability" of the temperatures in the FCC unit. *Young Tr.* at 29.

246. During the course of the temperature increases in the FCC unit on August 24–25, 2003, Young disagreed with the "operational actions" that the console operator on duty took to "correct the temperature increase" before she arrived on site at the facility. *Young Tr.* at 35–36.

247. Young speculated that the actions the console operator on duty took "probably made the problem [with the FCC unit temperature increase] worse." *Id.*

248. Nevertheless, Young also speculated that even "if [the console operator] hadn't done those maneuvers that made the problem worse," there still would have

been a problem (with the temperature increasing). *Young Tr.* at 36.

249. Based on Young's observations and personal perceptions of the PROMAX 2000 trial, Mobil "did not believe the PROMAX [2000] worked." *Young Tr.* at 33.

250. If the PROMAX 2000 had been effective in promoting combustion of carbon monoxide to carbon dioxide and maintaining the equilibrium temperature in the Chalmette FCC unit, Mobil would have benefitted because a non-noble based combustion promoter is less expense than a noble-based promoter. *Young Tr.* at 15.

251. Mobil did not use or purchase any additional PROMAX 2000 after the Chalmette trial because it believed that PROMAX 2000 was not as efficient or effective as a noble-based combustion promoter at promoting the combustion of carbon monoxide to carbon dioxide. *Young Tr.* at 33, 36.

252. Pearce testified, *see infra* findings 293–295, and I find, that the PROMAX 2000 that Mobil utilized for the trial was manufactured by Johnson Matthey but was neither chemically nor physically different in any significant way from the Combustion Promoter B additive that was manufactured by CMP. *Tr.* at 358–59, 382–83; *Young Tr.* at 79; *Kat. Exh. 61.*

253. After the Mobil trial was conducted, Smith (the director of marketing and sales for Triadd, who actually sold PROMAX 2000 to Mobil for the trial) reported that there were "no adverse effects on [the FCC] unit operation [after the addition of the PROMAX 2000]." *Young Tr.* at 12; *CMP Exh. 133.*

254. McDaniel initially agreed with Smith in the 1997 NPRA paper and presentations that followed, but later recanted the conclusions in the NPRA paper and testified during trial that, similar to Young's deposition testimony, the trial at

Mobil "was basically a disaster." *Tr.* at 130, 1166–70.

255. At this point in 1997 (after the Chalmette trial), McDaniel (and KataLeuna) was "getting very suspicious about [PROMAX 2000's (Combustion Promoter B's) ] performance." *Tr.* at 130.

256. Although McDaniel was "fairly well convinced that the cobalt-based combustion promoter didn't work with the same efficiency as the platinum based promoter [he and KataLeuna] still weren't a hundred percent convinced [that] it was a failure." *Tr.* at 130–31.

257. McDaniel and KataLeuna elected to "do some other testing of the promoter [ (Combustion Promoter B) ] besides just putting it into refineries" before concluding that Combustion Promoter B was commercially ineffectively. *Tr.* at 131.

- **Akzo Testing of Combustion Promoter B**

258. In late 1998, McDaniel forwarded a sample of PROMAX 2000 and two noble metal-based promoters to Akzo Nobel in Amersfoort, Holland. *Zeller Tr.* at 10–12.[8]

259. Akzo is a large catalyst manufacturer interested in combustion promoter additive technology. *Zeller Tr.* at 10–12., 15

260. In 1998, Akzo was interested in evaluating KataLeuna's combustion promoter additives (purchased from CMP under the TTA) for potential use by Akzo's customers. *Zeller Tr.* at 15.

261. Akzo had the samples provided by KataLeuna analyzed and tested for efficiency as combustion promoters. *Zeller Tr.* at 11–12.

262. Akzo forwarded the samples to an outside lab, SGS Redwood Netherlands B.V. ("SGS"), to conduct a lab scale carbon

oxide combustion promoter conversion efficiency test. *Zeller Tr.* at 12–13.

263. In essence, this test measured the conversion rate of carbon monoxide to carbon dioxide. *Zeller Tr.* at 13.

264. In 1999, Akzo concluded that PROMAX 2000 was not an effective promoter because PROMAX 2000 only showed a conversion rate of 19%, while the noble metal (platinum) based promoters showed a conversion rate of 90–95%. *Zeller Tr.* at 14–16.

265. Akzo determined that it was not interested in pursuing PROMAX 2000 as a combustion promoter because of the "low ranking of the sample." *Zeller Tr.* at 15, 23.

266. CMP attacks Zeller's testimony because he did not physically travel to the Netherlands to witness the SGS testing, never saw the promoter samples that were tested, had limited information about the promoter testing done, and did not independently confirm the accuracy of the ppm (parts-per-million platinum equivalency) measurement used to dilute the promoter samples during testing to compare their effectiveness to the same quantity of industry standard platinum based promoter, *Zeller Tr.* at 10–13, but these contentions provide scant reason to discount heavily Zeller's testimony.

267. CMP also asserts that McDaniel reported inaccurate ppm platinum equivalences for the three CMP promoter samples tested by Akzo, and therefore, may have caused the dilution and comparison process to be skewed, making the test results indicating combustion promoter effectiveness inaccurate, *Zeller Tr.* at 11–16; *Zeller Tr. Exh. 3* at 8, but these conten-

---

**8.** All references herein to John Zeller's deposition testimony are noted as "Zeller Tr." The Zeller deposition was taken in Houston, Texas, on January 15, 2003.

tions provide scant reason to discount heavily McDaniel's testimony.

268. Finally, CMP asserts that its samples were somehow "coked-up," *see supra* finding 30, and SGS performed a "de-coking" process before the trials were conducted that may have negatively affected PROMAX 2000's effectiveness as a promoter, *Tr.* at 36–37; *Zeller Tr. Exh. 3* at 12, but these contentions provide scant reason to discount heavily this evidence.

269. Even assuming *arguendo* that CMP's assertions have merit, KataLeuna contends and I find that, regardless of the alleged differences in dilution rates (*350 ppm v. 500 ppm platinum equivalency*), the Akzo testing results (using 350 ppm), *see Zeller Tr.* at 14–16, *and* Dr. Pearce's results (using 500 ppm), discussed *infra* fact nos. 276–307, of the PROMAX 2000's effectiveness were both *significantly* lower than the industry standard noble-metal (platinum) based promoters. *Id.; Zeller Tr.* at 14–16 and *Zeller Tr. Exh. 2* (19% promoter efficiency rate at 350 ppm); *Tr.* at 375–76 and *Kat. Exh. 65* (15–18% promoter efficiency rate at 500 ppm); *see also supra* finding 264.

270. KataLeuna contends and I find that the test results obtained from Akzo in August 1999 conclusively established that the combustion promoter did not work. *Tr.* at 149–50, 159.

271. McDaniel testified, and I find, that it was not until August 1999 that he finally concluded that the technology transferred from CMP to KataLeuna under the TTA provided KataLeuna with nothing of value. *Id.*

● **Expert Analysis of Combustion Promoter B**

272. Dr. John Pearce is the Vice President of Technology at Tricat Zeolites GmbH since 1999. *Tr.* at 353.

273. Dr. Pearce has a Ph.D. in chemistry and has worked in the field of FCC additives since 1985.

274. He was employed by Union Carbide Corp. from 1981 to 1985 and by Akzo from 1985 until 1999. *Tr.* at 354–55.

275. Dr. Pearce was accepted as KataLeuna's expert in the field of FCC additives. *Tr.* at 356.

276. In the course of discovery in this case, CMP provided KataLeuna with two samples of Combustion Promoter B manufactured by CMP.

277. The samples were marked: "1st Production Dartmouth Trial" and "2nd Production Data Presented at NPRA Meeting." *Tr.* at 357–58, 564–65, 375, 569–67 (Dr. Pearce); *Kat. Exh. 337* at 2 (CMP's Response to the Request for Production of Documents By KataLeuna).

278. KataLeuna requested that Dr. Pearce test the Combustion Promoter B samples to determine the effectiveness of the promoters. *Id.*

279. In 1999, Dr. Pearce commissioned SGS to test samples of Combustion Promoter B (manufactured by CMP and Johnson Matthey) and several other combustion promoter samples, including samples of a conventional platinum-based (noble metal) combustion promoter. *Tr.* at 358–59.

280. Dr. Pearce chose SGS because of the company's experience in FCC-related testing, including additives, and because of its experience as the analytical lab for an FCC company. *Tr.* at 359–60.

281. Dr. Pearce's "objective was to compare all of these additives [combustion promoter samples] on a constant basis, including the test conditions, the temperatures, the flow rates, the level of dilution, to take all of these on an equal footing, test them in an identical fashion and see if

**638**

any were better or worse than [other samples]." *Tr.* at 407.

282. Dr. Pearce also compared the Combustion Promoter B samples to determine if the amount of active materials on the surface of those samples "were the same or different." *Tr.* at 420.

283. Dr. Pearce requested that SGS conduct an X-ray fluorescence ("XRF") test on the samples to determine how much of various elements were present on the surface of the sample. *Tr.* at 360.

284. Dr. Pearce described the XRF test as follows: "[e]ach element in a sample that is being examined gives off a series of characteristic emissions or radiations under the conditions of the test. A sensitive detector is placed close to the sample to pick up the emissions. The detector analyzes, digitizes and reduces that to a set of numbers that can be compared and analyzed." *Tr.* at 360; *Kat. Exh. 66.*

285. The XRF test provided quantitative numbers in tabular form regarding the characteristics of each sample. *Tr.* at 366–67; *Kat. Exh. 61* at DEF 017586; *Kat. Exh. 66.*

286. Dr. Pearce extracted the data for each sample and compared the levels of strontium, lanthanum and cobalt in each sample. *Tr.* at 370; *Kat. Exh. 61* at DEF 017576 (Johnson–Matthey), DEF 017581 (CMP–PROMAX) and DEF 017586 (2nd production run).

287. Based on the data produced by the XRF test, Dr. Pearce concluded that all of the Combustion Promoter B or purple-colored samples contained equivalent amounts of cobalt, lanthanum and strontium. *Tr.* at 361, 362, 364, 370–71; *Kat. Exhs. 61, 66.*

288. Dr. Pearce also had the Combustion Promoter B samples tested for surface area, bulk density and attrition index. *Tr.* at 378, *Kat. Exh. 65.*

289. CMP asserts that the Davison Index ("DI") is the industry standard for measuring and characterizing the "attrition" resistance of FCC additive catalyst particles. *Tr.* at 969 (McCauley), 1496 (Dr. Albers).

290. Dr. Albers testified that the units of measurement for the DI are weight percentage loss per five-hour period and a DI of 10 or less is preferred. *Id.*

291. Further, CMP specifically asserts that SGS reported to Dr. Pearce that the combustion promoter samples' attrition resistance was .55% weight loss per second (inexplicable by either CMP or KataLeuna) which would result in virtually none of the original sample remaining after one hour of attrition. *Tr.* at 410–12; *Tr.* at 969–70, 972–74; *Tr.* at 1495–96.

292. CMP claims the attrition index for its promoter product was a DI of 10 with approximately 98% of the promoter remaining after one hour, implying that the promoter additive that Dr. Pearce tested did not come from its laboratories. *Tr.* at 1496–99.

293. Nevertheless, based on the results of these tests (surface area, bulk density, and attrition index), Dr. Pearce concluded to a reasonable degree of scientific certainty and I find that the Combustion Promoter B samples manufactured by CMP and by Johnson Matthey were essentially equivalent, except that the CMP-manufactured samples had a "significantly higher surface area" because a different type of alumina was utilized "for the supports for [the] metals." *Tr.* at 378–79, 382–83; 420.

294. Since "[t]he particular choice of alumina which is used in the support [of the metals] is a minor[,] if even existent[,] factor" these results did not affect Dr. Pearce's final conclusion that the CMP and

Johnson Matthey samples were equivalent. *Tr.* at 379.

295. Dr. Pearce concluded to a reasonable degree of scientific certainty that the CMP and Johnson–Matthey samples of Combustion Promoter B were chemically the same, *Tr.* at 382–83, and I so find.

296. Dr. Pearce also requested that SGS conduct a combustion promoter conversion test for each sample (testing the "efficiency of the relative abilities of [the] additive to catalyze the reaction of carbon monoxide to carbon dioxide"). *Tr.* at 371; *Kat. Exh.* 65.

297. Dr. Pearce explained that combustion promoter additives "catalyze the reaction of carbon monoxide to form carbon dioxide in an FCC unit." *Tr.* at 371.

298. "The reason for the [combustion promoter test] in the laboratory is to measure exactly that, the efficiency of the relative abilities of these additives to catalyze the reaction of carbon monoxide to form carbon dioxide." *Id.*

299. Dr. Pearce described the test as follows: (a) the additives of interest (combustion promoter in this case) are diluted to a level that is typical of what is commercially used; (b) the additives are then placed in the reactor (fluid bed reactor in this case); (c) the additives are heated "up to reaction temperature;" (d) a mixture of carbon monoxide and oxygen and carbon dioxide and nitrogen are introduced at a standard rate through the inlet to a fluid bed reactor; and then (e) the amount of carbon monoxide that has been consumed as a result of passing through the catalyst and additive is measured at the outlet of the reactor. *Tr.* at 371–72.

300. Dr. Pearce explained that "the percent of carbon monoxide that is converted to carbon dioxide as a result of this reaction [of additives, catalysts, and gas-es]" is what the test actually measures. *Id.*

301. A test that results in a high number means that the additive is efficient at converting carbon monoxide to carbon dioxide, while a low number means that the additive is not effective at converting carbon monoxide to carbon dioxide. *Tr.* at 372.

302. The test is designed to best predict, reliably and accurately, how an additive can be expected to perform in an FCC unit "in the commercial world." *Tr.* at 374.

303. Dr. Pearce testified that a typical platinum-based (noble metal) promoter usually converts 99% of the carbon monoxide to carbon dioxide. *Tr.* at 373.

304. Dr. Pearce also testified that a carbon monoxide to carbon dioxide conversion rate "greater than 90 percent would be considered probably acceptable. A number substantially below that would be questionable and much below that would be considered dubious." *Id.*

305. In the testing supervised by Dr. Pearce, the Combustion Promoter B samples converted between 15% and 18% of carbon monoxide to carbon dioxide. *Tr.* at 375–76; *Kat. Exh.* 65.

306. The conventional platinum-based promoter samples "in this test that would be typical of a commercial or useful combustion promoter," however, demonstrated a 99% efficiency rating (conversion of carbon monoxide to carbon dioxide). *Tr.* at 373; *Kat. Exh.* 65.

307. Although Dr. Pearce did not witness the actual testing by SGS, based on the results of the XRF and conversion tests performed on the promoter samples, Dr. Pearce concluded to a reasonable degree of scientific certainty that Combustion Promoter B is not as effective as the industry standard noble metal (platinum)

based combustion promoter at promoting the combustion of carbon monoxide to carbon dioxide in an FCC unit, *Tr.* at 383, and I so find.

## • Effectiveness of Combustion Promoter B

308. Combustion Promoter B is not effective in the promotion of combustion of carbon monoxide to carbon dioxide in an FCC unit. *Kat. Exhs. 61, 65, 66; Tr.* at 383.

309. Combustion Promoter B does not demonstrate the same efficiency as the industry standard noble metal (platinum) additive in converting carbon monoxide to carbon dioxide. *Id.; Tr.* at 375–760.

310. Although CMP asserts that Combustion Promoter B (having a conversion rate of approximately 15–19%) is at best 19 times more effective than the noble metal based combustion promoter using osmium (having a conversion rate of approximately 1%), I find that comparing Combustion Promoter B to any combustion promoter (noble metal based or otherwise) with a conversion rate of 1% (approximately 90–95 times *below* the extant industry standard) is not contemplated under the TTA, *Tr.* at 1379–80, 1385–87, and would reduce the TTA to an absurdly non-economic undertaking clearly not within the contemplation of the parties.

311. CMP produced no admissible evidence to demonstrate the commercial effectiveness of Combustion Promoter B.

312. Contrary to CMP's assertions that there was no guarantee that the combustion promoter technology transferred under the TTA would be as effective as the commercial or industry standard (a platinum-based additive) promoter, I find that

the industry standard provides the most useful benchmark against which to determine the effectiveness, utility, value, and efficacy of the combustion promoter technology transferred under the TTA.

313. CMP represented in the TTA that KataLeuna had the "exclusive power and authority to make, *use and sell* the Combustion Promoter B Technology," *Kat. Exh. 80* at ¶ 4(b)(1) (emphasis added), and that CMP had delivered to KataLeuna "certain information (the "Technology Results"),[9] demonstrating the *viability and the reliability* of the Combustion Promoter B Technology ... [and] these reports are true ... and do not misrepresent any facts ... which ... would cause the reports ... to be misleading ...." *Kat. Exh. 80* at ¶ 4(b)(9) (emphasis added).

314. CMP did not transfer or assign to KataLeuna an effective (commercially viable) non-noble (zinc titanate) based combustion promoter under the TTA. *See supra* findings 210, 264, 269, 307, 310.

315. The Combustion Promoter B patent application assigned to KataLeuna by CMP under the TTA did not provide KataLeuna with anything of value. *See id.*

316. The Combustion Promoter B technology transferred from CMP under the TTA provided KataLeuna with nothing of value. *See id.*

## D. Patent Prosecution Histories

317. Originally, Dr. Albers, on behalf of CMP, hired patent counsel (Paul Grandinetti, Esq.) to prepare and file the patent applications for the technology that was transferred to KataLeuna under the TTA. *Tr.* at 57, 339–40.

9. Although the term is not defined in the TTA, "Technology Results" can only reasonably be understood to refer to the two early commercial trials that CMP conducted using the

Combustion Promoter B (PROMAX 2000) at Ultramar Refining and Consumer's Co-op in February 1995. *See supra* findings 189–205.

318. Prior to the execution of the TTA, Dr. Albers worked on, prepared and controlled the patent application process. *Tr.* at 57, 339–40.

319. After the execution of the TTA, KataLeuna hired Arthur Steiner, Esq., and Christopher Brody, Esq., of Lowe, Price, LeBlanc & Becker as its patent counsel to continue the prosecution of the patent applications that were transferred to KataLeuna. *Tr.* at 96–97, 543–44.[10]

320. Steiner worked for the United States Patent Office ("Patent Office") from 1966 to 1970 and from 1973 to 1993, and served on the Board of Patent Appeals as an administrative law judge. *Tr.* at 537.

321. Steiner currently is a patent attorney with McDermott, Will & Emery in Washington, D.C. *Tr.* at 537–38.

322. Steiner handled thousands of cases as an administrative law judge. *Tr.* at 553.

323. Steiner also currently handles more than one thousand patent matters per year. *Tr.* at 551.

324. Steiner previously has served as an expert witness and provided expert reports with regard to patent prosecution in numerous cases. *Tr.* at 538–39.

325. Steiner was accepted as an expert witness in patents and patent prosecution without objection. *Tr.* at 543.

### i. The SOx A Patent Application

326. When Steiner and/or Brody filed the SOx A patent application transferred through the TTA with the USPTO, the substantive office action from the USPTO initially imposed a restriction requirement on the application. *Tr.* at 555–56; *Kat. Exh. 279.*

327. Steiner testified that if a patent examiner considers the claims in a patent application "to be directed to more than one invention, he typically would impose a restriction requirement and require [that] you elect one of them." *Tr.* at 555.

328. In a telephone conversation with the examiner on May 21, 1997, Steiner made a "provisional election with traverse" to only prosecute claims 1–25 of the SOx A patent application. *Tr.* at 555–56; *Kat. Exh. 279.*

329. The remaining claims in the SOx A patent application, claims 26 through 54, were withdrawn and not considered by the examiner. *Id.*

330. A patent examiner will reject a claim under 35 U.S.C. § 102 if a "claim[ed] invention is identically disclosed in the prior art." *Tr.* at 557.

331. On May 30, 1997, the USPTO rejected claims 1–25 of the SOx A patent application under 35 U.S.C. §§ 102 and 103 as anticipated by or obvious under the prior patents of *Saito et al.* (U.S. 4,749,-671) and *Pinnavaia, et al.* (U.S. 5,298,-473). *Tr.* at 555–56; *Kat. Ex. 279* at 5–6.

10. Throughout its post-trial submissions, CMP repeatedly asserts that (1) KataLeuna had no interest or involvement in the FCC additive business after the beginning of 1997 because the additive technology it purchased from CMP was sold/transferred to TII, effective January 1, 1997, (2) all patent prosecution work done by Steiner and his law firm after January 1, 1997, was billed to and paid by TII, and (3) Steiner's primary contact for the work with TII after January 1, 1997, was McDaniel (of Tricat not KataLeuna). *See, e.g.,*

*CMP's Rebuttal Responses to KataLeuna's Proposed Findings of Fact* at nos. 112–13, 115. Nevertheless, I find, as discussed *supra* n. 4, that for purposes of this case, KataLeuna properly refers to its corporate entity (and employees) as the party involved in the additive test runs, patent prosecutions, and other activities resulting from the TTA regardless of the date they occurred, particularly because KataLeuna never actually sold or transferred its technology to TII, *see infra* findings 314–315.

332. In an amendment filed on July 2, 1997, Steiner attempted to modify the patent application in response to the examiner's May 30, 1997, office action. *Tr.* at 556; *Kat. Exh. 278.*

333. On October 12, 1997, the USPTO issued a final action under 35 U.S.C. § 102 rejecting claims 1–9, 13–21, 23–25 and 55–60 as anticipated by or obvious over *Gupta, et al.* (U.S. 5,254,516) (RTI and Gupta patent). *Tr.* at 556–57; *Kat. Exhs. 276* at 3, *302* (Patent); *see supra* findings 93, 100, 129.

334. On January 21, 1998, Steiner filed an amendment under 37 C.F.R. § 1.116 to get around the rejection based on the *Gupta* patent. *Tr.* at 557–58; *Kat. Exh. 275.*

335. Steiner argued that the CMP patent only functioned in an FCC environment and that the Gupta patent did not "disclose catalytic cracking and ... was not concerned with the strength of the catalyst which was given to it by the binder." *Tr.* at 558; *Kat. Exh. 275.*

336. On September 1, 1998, a patent based on the SOx A additive and SOx A patent application, which CMP sold to KataLeuna under the TTA, issued as Patent No. 5,801,115 and was assigned to KataLeuna. *Kat. Exh. 205.*

337. The SOx A patent as issued does not cover the use of the SOx A technology in power plants. *Tr.* at 558–59; *Kat. Exh. 205.*

338. CMP alleges that the "original scope of CMP's SOx A invention ... always required the use of an anionic fluorohydrocarbon surfactant material [the so-called "Thiele Technology"]" which would have "distinguished the SOx A patent application claims from all "prior art" cited by the USPTO in their Office Actions. *Tr.* at 1432–33, 1439, 1442–47 (Dr. Albers).

339. The "Thiele Technology" (and other desirable surfactants referred to in the SOx A) is a type of anionic fluorohydrocarbon surfactant that "enhance[s] the manufacturing process when making the catalyst ... [and] aid[s] in the dispersion of the individual component particles that make up the catalyst and provide for particles that have superior density and hardness characteristics." *Kat. Exh. 86* at 6–7.

340. Although CMP asserts that the "Thiele Technology" was "paramount to the technology that was transferred [under the TTA]," Dr. Albers could not point to a particular provision in the TTA that says that the Thiele Technology must be used in connection with developing the additive technologies. *Tr.* at 1773–75 (Dr. Albers).

341. Dr. Albers's trial testimony confirms that the "Thiele Technology" was not specifically referenced in the SOx A patent application; instead, the patent application states that "numerous surfactants can be used" without specifying a particular surfactant or even explicitly requiring that surfactants be used in the preferred embodiment. *Tr.* at 1784–88; *Kat. Exh. 86* at 10–11 (SOx A patent application).

342. The SOx A patent is "dramatically limited" when compared to the original claims encompassed in the SOx A patent application and does not contain the original claims that read on the *Gupta* patent. *Id.*

343. CMP alleges, without providing supporting evidence or eliciting supporting testimony, that KataLeuna had an obligation to contact CMP when it encountered difficulties with obtaining patents for the SOx A and Combustion Promoter B technology. *See, e.g., Tr.* at 1292–95.

344. Neither KataLeuna nor its patent counsel, however, had any obligation to contact Dr. Albers, CMP, or anyone other than KataLeuna's designated corporate representative regarding the patent prosecution process, *see id.,* and KataLeuna was

not required to list Dr. Albers or Burkhead as inventors on the continuation-in-part application for the Combustion Promoter B. *Tr.* at 563.

345. Further, nothing in the trial record supports CMP's suggestion that had Dr. Albers been consulted, Mr. Steiner would have obtained more successful results with the USPTO in obtaining the Combustion Promoter B patent (based on the original CMP patent application).

346. There is no evidence that Dr. Albers or CMP could have avoided the USPTO restriction of the SOx A and Combustion Promoter B patent application claims or the complete rejection of the Octane B patent application (*see* findings *infra* ).

347. Steiner's expert opinion is that the patent that ultimately issued on SOx A was substantially narrower than the original SOx A patent application that CMP sold and assigned to KataLeuna under the TTA. *Tr.* at 558–59.

348. The original patent application claim 1 only required "at least one SOx capturing oxide and at least one inorganic binder" and was not limited to any particular use. *Tr.* at 559; *Kat. Exh. 86.*

349. The patent that issued on SOx A was (a) limited to zinc titanate (for use as the emission control additive), (b) required a specific binder combination and composition, and (c) was limited to a fluid cracking catalyst application. *Tr.* at 559.

350. It is apparent that the true scope of the original SOx A invention (as described by CMP in the patent application sold under the TTA) was limited after the amendments were made, and I find, consonant with Steiner's conclusion, that the patent that issued on SOx A was "indeed dramatically limited compared to the original claim[s]." *Id.*

351. I add that CMP seeks to introduce and reference in their post-trial submissions certain technologies and patents ("the McCauley Technologies") that TCP and TII developed and refined after January 1, 1997 (when KataLeuna "separated" from Tricat) that are allegedly related to SOx B and Combustion Promoter A technology transferred under the TTA.

352. After hearing extensive argument from counsel during trial, however, I reiterated my prior rulings and concluded that there was no evidence to demonstrate that the McCauley Technologies were at all relevant to rescission of the TTA. *Tr.* at 1751–56, 1760–65; *see also Contracts Materials Processing, Inc.*, 164 F.Supp.2d at 532, n. 21.

### ii. The Combustion Promoter B Patent Application

353. On April 4, 1997, the USPTO issued a final rejection of certain claims set forth in the Combustion Promoter B patent application (filed by Grandinetti as part of the TTA) based on obviousness predicated upon prior patents. *Tr.* at 560–61; *Kat. Exh. 268.*

354. On May 27, 1997, Steiner filed an amendment after final rejection under 37 C.F.R. § 1.116 in response to the USPTO's ruling. *Tr.* at 560; *Kat. Exh. 268.*

355. On June 6, 1997, the patent examiner ruled that the amendment would not be entered because it "raise[d] new issues that would require further consideration and/or search" and it "raise[d] the issue of new matter." *Tr.* at 561; *Kat. Exh. 267.*

356. On June 13, 1997, Steiner filed a continuation-in-part application, which was assigned application number 08/874,635 and listed McDaniel and McCauley as inventors. *Tr.* at 562–63; *CMP Exh. 85.*

357. The continuation-in-part was predicated upon the amendment that was not allowed by the June 6, 1997, Office

Action from the USPTO. *Tr.* at 562; *CMP Exh. 85.*

358. A continuation-in-part application adds information or claims that were not disclosed in the original patent application. *Id.*

359. On June 18, 1997, Steiner also filed a continuation application, which was assigned number 08/878,074. *Tr.* at 562

360. A continuation is the same application that was originally filed. *Tr.* at 562–63; *see, e.g., Kat. Exh. 87.*

361. In connection with the Combustion Promoter B patent application Steiner elected to take both approaches—filing a continuation application to challenge the examiner's determination that new matter was added to the amendment filed after the USPTO's rejection of all claims in the original patent application and by filing a continuation-in-part that includes the new information as part of the original patent application. *Id.*

362. On November 24, 1997, the patent examiner rejected the claims in the continuation application for a number of reasons, including that they were unpatentable over prior art. *Tr.* at 564.

363. Steiner filed an amendment to the continuation application in order to distinguish the CMP Combustion Promoter B from the prior art, but the patent examiner did not accept Steiner's arguments. *Tr.* at 562–64

364. Steiner appealed the patent examiner's ruling to the Board of Patent Appeals, but the patent examiner's substan-

tive ruling on the continuation claims was affirmed in 2002. *Tr.* at 564.

365. U.S. Patent number 6,117,813 issued, however, on the Combustion Promoter B continuation-in-part application on September 12, 2000. *Tr.* at 564; *CMP Exh. 86.*

366. I note that CMP asserts that the text of the continuation-in-part patent application for the Combustion Promoter B is copied from and virtually identical to the original CMP Combustion Promoter B application filed on May 2, 1995, except for the explicit statement that the binder to be used in making the additive does not include "mullite." [11] *CMP's Rebuttal Responses to KataLeuna's Proposed Findings of Fact* at nos. 125–33.

367. CMP also asserts that there were false statements included in the continuation-in-part application filed by KataLeuna concerning either the mullite carrier material, the exclusion of Dr. Albers and Burkhead as inventors, or the overall effectiveness of the combustion promoter, *Tr.* at 157–58; *see supra* fact nos. 344, 366, and KataLeuna had an affirmative obligation to report these "false statements" to the USPTO. *CMP's Rebuttal Responses to KataLeuna's Proposed Findings of Fact* at nos. 125–33.

368. I find, however, that the continuation-in-part application filed by KataLeuna which led to the issuance of U.S. Patent number 6,117,813, is not identical to the original CMP promoter application transferred under the TTA; a patent issued on the combustion promoter continuation-in-

---

11. Apparently the mullite carrier material was used in relation to patents for an effective combustion promoter with nitrogen oxide from two Chinese inventors. McDaniel testified that the Chinese patents claimed that "the mullite support worked in conjunction with the active metals, the cobalt, strontium and lanthanum [ (also used in the CMP Com-

bustion Promoter B) ], and together those metals ... and the mullite structure interacted in a favorable manner to be an interactive CO-combustion promoter." *Tr.* at 203–05. McDaniel testified, however, that CMP did not use the mullite support in CMP combustion promoter application. *Tr.* at 214–15.

part application only after substantial prosecution efforts (and changes) by Kata-Leuna and their patent counsel. *Tr.* at 564; *CMP Exh. 86; Kat. Exh. 87.*

369. I further find that CMP's assertions regarding *intentional* false statements made by KataLeuna in the continuation-in-part application are without sufficient supporting evidence, the alleged statements were not "material to patentability" of the combustion promoter invention, and McDaniel did not become aware of the alleged false statements until *after* the issuance of the promoter patent.[12] *Tr.* at 157–58, 248–59.

### iii. The Octane Enhancer Patent Application

370. Under the TTA, the Octane B additive technology is defined as an "octane enhancer that is not ZSM–5 based and for which a U.S. Patent Application" has been filed. *Kat. Exh. 80,* ¶ 1(n)(3).

371. Octane B is based on clinoptilolite (an ingredient used instead of ZSM–5). *Tr.* at 55.

372. Oil refineries utilize octane enhancers in FCC units to react "with the oil so that the gasoline that is produced has a higher octane level." *Tr.* at 41–42.

373. Octane enhancers are typically a combination of an active ingredient, a zeolite, and clay. *Tr.* at 54–55.

374. Commercially available zeolites are synthetically produced. *Tr.* at 55.

375. Mobil holds a patent for these synthetic zeolites, called ZSM–5 (Zeolite Socony Mobil), and a license must be procured from Mobil in order to manufacture them commercially. *Tr.* at 55.

376. CMP believed that a naturally occurring zeolite, like clinoptilolite, that was not synthetically produced, would have cost and market advantages because no royalty payments would have to be paid to Mobil and the raw materials involved were cheaper. *Tr.* at 55.

377. CMP filed a patent application for Octane B on September 12, 1995, and it was assigned Serial No. 08/526,976. *See Kat. Exhs. 76, 85.*

378. The Octane B patent application was assigned to KataLeuna under the TTA, and CMP represented that, "to the best of [CMP's] ... knowledge, all information contained in the CMP Patent Application[ ] is true, complete and correct and contains no errors or omissions as filed," and KataLeuna is "entitled to rely upon" all statements contained in the Octane B patent application as representations made by CMP directly to KataLeuna. *Kat. Exhs. 75, 80* at ¶ 4(b)(6).

379. On January 23, 1997, the patent examiner issued an Office Action rejecting Claims 11 through 28 and claims 40–42 of the Octane B patent application under 35 U.S.C. §§ 102 and 103 as "obvious" or "anticipated by" prior art and under 35 U.S.C. § 112 as "indefinite." *Tr.* at 546; *Kat. Exh. 295.*

380. The claims in the octane enhancer patent application were rejected because they were "based on prior art," and were based on a South African patent issued to Hutchings, referred to by Abstract No., ZA 7,886,732. *Tr.* at 546–47; *Kat. Exhs. 295, 289.*

---

12. CMP makes reference to McDaniel's obligation under "Rule 56" of the USPTO's Rules of Practice in Patent Cases to report false statements/information pertaining to a patent application to the USPTO. *See* 37 C.F.R. § 1.56(a)-(b) and (e). Reporting obligations under Rule 56 are expressly limited to "information ... material to patentability" that is discovered before the issuance of the patent. *Id.*

381. Patent counsel, Brody, filed an amendment on April 29, 1997, in which, among other things, he attempted to distinguish the claims in the Octane B patent application from those in the South African patent. *Tr.* at 548; *Kat. Exh. 294.*

382. CMP alleges, without credible support in the evidence, that if Steiner had prepared and submitted claim limitations based on use of an "anionic fluorohydrocarbon surfactant" material to the USPTO for the Octane B patent application, the claims in the application would have immediately and easily been distinguished from the "prior art" references cited by the Patent Examiner.

383. I find that CMP's assertions regarding the claim limitations are unfounded; there is no credible evidence of any obligation whereby KataLeuna was to consult with CMP or Dr. Albers throughout the patent prosecution process.

384. On August 1, 1997, the patent examiner issued a Final Office Action that reiterated and affirmed rejection of the claims in the Octane B patent application pursuant to 35 U.S.C. §§ 102 and 103 on the basis of the claims contained in the South African patent. *Tr.* at 549; *Kat. Exh. 298.*

385. On September 8, 1997, Steiner filed an amendment after final office action under 37 C.F.R. § 1.116, again attempting to distinguish the claims from the South African patent. *Tr.* at 550; *Kat. Exh. 292.*

386. On September 19, 1997, the patent examiner refused to enter the amendment, because it "would introduce rejections under 35 U.S.C. § 112 because claims 19, 21, 26 and 28 would then depend upon canceled claims." *Kat. Exh. 297; Tr.* at 550–51.

387. Because of these "formalistic" reasons, the patent examiner would not enter the proposed amendment. *Id.*

388. On September 25, 1997, Steiner filed a second amendment under 37 C.F.R. § 1.116 to attempt again to obtain allowance of the claims notwithstanding the South African patent. *Tr.* at 551; *Kat. Exh. 272.*

389. On October 10, 1997, the patent examiner found that, although prior "formalistic" rejections for indefiniteness under 35 U.S.C. § 112 had been overcome by the second amendment, claims 11–28, 40–42 and 48–50 were nonetheless again rejected because of the South African patent. *Tr.* at 551; *Kat. Exh. 273.*

390. No further action was taken in prosecution of the Octane B patent application because "it would have been futile to continue prosecution of this application based upon primarily the South African reference." *Tr.* at 553.

391. Steiner opined that "if we would have gone to appeal [on the Octane B patent application,] we would have lost." *Id.*

392. Although CMP alleges that it did not make any representation or warranty to KataLeuna in the TTA about the scope of the patent claims that might ultimately issue based upon the Octane B patent application, or that any patent would ultimately issue at all, I find that the representations made in the actual patent application are incorporated by reference into the TTA. *See Kat. Exh. 80* at ¶ 4(b)(6).

393. Based on language in the TTA and the oaths and obligations associated with filing the Octane B patent application, I find that CMP falsely represented and recklessly warranted that the Octane B technology was "new, useful, and unobvious," *see Kat. Exh. 80* at ¶ 4(b)(13)-(14); indeed, Steiner testified about the USPTO's "killer reference" to a South African patent that had been issued protecting es-

sentially the same octane technology used in FCC units. *Tr.* at 546–47, 549–51, 553–54.

394. Steiner, an expert in patent prosecution with over 30 years of experience, testified, and I find, that the South African patent was a "killer reference" and would ultimately preclude a patent from being issued even if further prosecution. efforts had been undertaken. *Tr.* at 553–54.

395. The South African patent was a "killer reference" because it disclosed the use of clinoptilolite in a "hydrocarbon cracking process" (FCC process) and for use in a "fixed bed or fluidized bed." *Tr.* at 554.

396. Steiner stated that "the [patent] examiner made the point that the data [in the Octane B patent application] revealed that [the invention] was an octane enhancer," so the rejected claims in the Octane B patent application could not overcome the prior disclosure in the South African patent. *Tr.* at 554.

397. CMP offered no credible testimony to contradict Steiner's opinion regarding the patentability of the Octane B technology (specifically that the "killer reference" essentially prevented a patent from issuing). *Id.*

398. The Octane B patent application assigned by CMP to KataLeuna under the TTA thus provided KataLeuna with nothing of value.

### iv. Hydrotalcite Patents and Technology

399. Under ¶ 18(b) of the TTA, CMP was obligated to "grant[ ] to [KataLeuna] a right of first refusal with respect to ... all of [CMP's] rights now existing or [later] created [after the execution of the TTA] including any patents to make, use and sell any and all sulfur oxide pollution control [additives], ... without any additional con-

sideration to [CMP] ...." *Tr.* at 78; *Kat. Exh. 80* at ¶ 18(b).

400. Subsequent to execution of the TTA, CMP applied for and received patents for another SOx emission control additive based on a material known as hydrotalcite. *Kat. Exh. 328.*

401. Neither a hydrotalcite SOx additive nor a copper and palladium-based combustion promoter additive was ever transferred from CMP to KataLeuna under the TTA. *See Kat. Exh. 80, 327, 328; Tr.* at 332–33.

402. On June 13, 1997, CMP filed a request for a patent application that was assigned Serial No. 08/874,511. *Id.*

403. On July 27, 1999, U.S. Patent No. 5,928,496, entitled "Hydrotalcite Sulfur Oxide Sorption," was issued to CMP with Dr. Albers and Burkhead named as inventors. *Id.*

404. On June 10, 1999, CMP filed a second request for a patent application for the hydrotalcite based SOx emission control additive technology that was assigned Serial No. 09/329,672. *Kat. Exh. 327.*

405. On December 5, 2000, U.S. Patent No. 6,156,696, entitled "Hydrotalcite Contact Materials" was issued to CMP with Dr. Albers and Burkhead named as inventors. *Id.*

406. Despite the "right of first refusal" clause in the TTA under ¶ 18(b) that CMP granted to KataLeuna, CMP did not offer Patent Nos. 5,928,496 and 6,156,696, or the corresponding invention, to KataLeuna. *Tr.* at 332–33; *Kat. Exh. 80* at ¶ 18(b).

407. CMP alleges that KataLeuna (through McDaniel) told CMP to discontinue all work under the RDA (Research and Development Agreement) related to the hydrotalcite SOx additive because a patent had been previously issued to Azko Cata-

lyst covering the hydrotalcite technology. *Tr.* at 1663–70.

408. CMP further alleges that it advised KataLeuna that CMP would continue to develop the hydrotalcite SOx additive outside the RDA using CMP resources and, therefore, KataLeuna has no entitlement to the resulting hydrotalcite patents under either the RDA or TTA. *Id.*

409. Regardless of the parties' disagreement surrounding the precise time period when KataLeuna directed CMP to discontinue research and development of the hydrotalcite SOx additive and when CMP actually filed patent applications and received two patents for the technology, I find that CMP had an obligation under the TTA to offer these hydrotalcite patents (and corresponding applications). *See Kat. Exhs. 327, 328; 80* at ¶ 18(b).

410. I find that the meaning of the "right of first refusal" clause in the TTA includes and extends beyond its traditional definition in that the "spirit" and "heart" of the TTA was that CMP was essentially selling (1) its FCC additives "promise" to KataLeuna, (2) its ability to get KataLeuna into the FCC additives industry, and (3) any newly discovered technology as a result of the TTA package; CMP was aware of this meaning and committed a knowing and/or reckless breach of its contractual duty to offer newly discovered technology (the hydrotalcite patents) to KataLeuna.

### v. History of KataLeuna and the Technologies after Execution of the TTA

411. Effective January 1, 1997, KataLeuna came under the sole control of the Bundesanstalt fur vereinigungsbedingte Sonderaufgaben ("BvS"). *Tr.* at 144–45.

412. Effective January 1, 1997, KataLeuna transferred the FCC additives business operations, to the extent that any existed, to TCP. *Tr.* at 144–45.

413. "[O]riginally, KataLeuna attempted to transfer the CMP Agreements to TCP under an April 1997, Agreement." *Contracts Materials Processing,* 164 F.Supp.2d at 537 n. 30; *see also Tr.* at 474, 1183–84.

414. TCP, however, retroactively transferred the CMP Agreements nullifying any possibility of an assignment. *Id.*

415. CMP never released KataLeuna from its rights and obligations to CMP under the TTA, and KataLeuna's rights and obligations to CMP under the TTA were never transferred to a third party. *Tr.* at 1181–84.

416. Although Goerlitz (General Manager of KataLeuna) stated that TCP was to pay 17 million Deutschmarks (approximately $10.2 million) to KataLeuna as consideration for the transfer, *inter alia,* of the KataLeuna FCC additives business, no money (or other consideration) was paid to KataLeuna by TCP for the technology transferred from CMP to KataLeuna under the TTA. *Tr.* at 469–71 (Goerlitz), 1181–84 (McDaniel).

417. There is no evidence that KataLeuna assigned the technology, patent applications, or patents that were transferred from CMP to KataLeuna based on the technology under the TTA to TCP or any third party. *Tr.* at 145, 1181–84.

### E. Rescission

418. R. Christopher Rosenthal is a certified public accountant with Ellin & Tucker, a firm in Baltimore. *Tr.* at 422.

419. Rosenthal has an M.B.A. in finance from the University of Maryland. *Tr.* at 423.

420. Rosenthal is currently a director and shareholder at Ellin & Tucker and is in charge of business litigation. *Tr.* at 424.

421. Rosenthal was accepted as KataLeuna's expert in the field of accounting. *Tr.* at 423–24.

422. With the assistance of McDaniel, and at KataLeuna's request, Rosenthal prepared a schedule of expenditures incurred by KataLeuna related to KataLeuna's rescission claim. *Tr.* at 425; *Kat. Exh. 73–A.*

423. Each expenditure has supporting detail and original invoices. *Tr.* at 426.

424. Any amounts originally stated in German Deutschmarks were converted to U.S. dollars based on the exchange rate in 1999 when the report was prepared but not based on the exchange rate at the time the expenditures were made. *Tr.* at 428.

425. Pursuant to the TTA, KataLeuna paid CMP $1,900,000 by November 27, 1995. *Tr.* at 84, 439–40; *Kat. Exh. 80.*

426. Pursuant to the TTA, KataLeuna deposited $600,000 with an escrow agent by November 27, 1995. *Tr.* at 84, 439–40.

427. CMP received $200,000 of these monies. *Tr.* at 84, 439–40; *Kat. Exh. 115.*

428. Pursuant to the TTA, KataLeuna transferred to CMP 5,000 shares of stock of TII with an agreed value of $75,000. *Tr.* at 84; *Kat. Exh. 80.*

429. KataLeuna paid the salaries, benefits and expenses for McDaniel and Smith (Triadd marketing and sales director), amounting to a total of approximately $272,742.04 (from Sept/Oct 1995—Mar/Apr 1997), for their efforts in attempting to develop a business based on the technology transferred from CMP to KataLeuna under the TTA. *Tr.* at 168, 440; *Kat. Exh. 73–A* at ET 0001–0005.

430. KataLeuna incurred expenses amounting to approximately $794,314.15 in connection with engineering costs paid to Lurgi (in 1996 and 1997) for a potential FCC additive plant to manufacture FCC additives based on the technology transferred from CMP to KataLeuna under the TTA. *Tr.* at 169, 440; *Kat. Exh. 73–A* at ET 0001 and 0006.

431. KataLeuna incurred approximately $15,853.79 in patent prosecution costs in 1996 and 1997 for the patents for the technology transferred from CMP to KataLeuna under the TTA. *Tr.* at 170; *Kat. Exh. 73–A* at ET 0001 and 0008.

432. KataLeuna incurred approximately $110,539.20 in miscellaneous/other expenses in connection with attempting to develop a potential business based on the technology transferred from CMP to KataLeuna under the TTA. *Tr.* at 170; *Kat. Exh. 73–A* at ET 0001 and 0009.

433. The miscellaneous expenses included "printing charges for fliers, brochures, ... the production of the NPRA paper [ (describing the additives business) ], advertising, ... pursui[ts] other than employee costs in trying to market the technologies ..." *Tr.* at 170; *Kat. Exh. 73–A* at ET 0001 and 0009.

434. KataLeuna incurred expenses, not including the purchase price paid to CMP under the TTA, totaling approximately $1,193,449.18 (for salaries, benefits, engineering costs, patent prosecution costs, and miscellaneous expenses) during the time period of September 1995 through April 1997 in attempting to develop a potential business based on the technology transferred from CMP to KataLeuna under the TTA. *Tr.* at 168, 427, 440; *Kat. Exh. 73–A.*

435. KataLeuna incurred expenses totaling $3,293,449.18 ($1,193,449.18 + $2,100,000 (the TTA purchase price)) as a result of the TTA.

436. CMP asserts that Rosenthal failed to consider the actual operating revenues (allegedly $215,000) that KataLeuna received from its FCC additives business

operations during the periods for which Rosenthal totaled the general expenditures, *CMP Exh. 222, 229,* but there is no credible evidence supporting this contention.

437. CMP further alleges that Rosenthal did not account for the planned losses (CMP claims a total of $844,000) that KataLeuna *expected to incur* during the "start up" period for its "new" FCC additives business, but there is no reasonable basis on which to include such hypothetical losses in the calculation of restitution.

438. Finally, with respect to the profits, CMP alleges that KataLeuna actually realized a $7.97 million "equitable profit" when it sold everything to the Tricat Group for $10.2 million at the beginning of 1997 (calculated by subtracting KataLeuna's actual expenditures ($2.24 million-which accounts for alleged operating revenue and planned losses) from the alleged proceeds from the sale of KataLeuna's FCC business ($10.2 million)).

439. With respect to CMP's two claims regarding operating revenue and planned losses, I find that CMP does not present sufficient evidence (or legal authority) to support either assertion and CMP did not pursue this line of inquiry with Rosenthal during trial; indeed, CMP specifically chose not to cross examine Rosenthal, *Tr.* at 429–33, despite the fact that CMP was warned that it would not be permitted to recall witnesses at will.

440. Similarly, with respect to CMP's claim that KataLeuna realized an equitable profit from the sale of its FCC additives business, there is no evidence to suggest that KataLeuna has paid any money or consideration to TCP for its FCC additives business or otherwise realized any profit for its FCC additives business despite CMP's vehement argument that KataLeuna transferred its technology and will realize a payment at some future date.

441. The evidence demonstrates that it was not until late 1999 that KataLeuna discovered that all of the technologies transferred under the TTA had no value and that rescission was warranted, *Tr.* at 149–50, 153, although I find there is reason to believe that, had McDaniel taken a more detached and dispassionate approach to his new responsibilities starting in late 1995, a more robust skepticism would have reduced KataLeuna's outlays in its efforts to develop the Technology.

442. Dr. Frank Goerlitz, the general manager of KataLeuna GmbH since July 1999, testified, and I find, that KataLeuna is willing to return to CMP all property and rights it obtained under the TTA to CMP and it shall be so ordered. *Tr.* at 441, 740.

443. To the extent that any of the Tricat companies has any of the FCC additive technologies transferred from CMP to KataLeuna under the TTA, the patent applications related to those technologies, or any patents obtained on those technologies, the Tricat companies are ready and willing to return all such property to KataLeuna for its return to CMP, *Tr.* at 163–64, and it shall be so ordered.

### III. Conclusions of Law

1. Jurisdiction is proper in this Court under 28 U.S.C. § 1332.

2. There is diversity of citizenship in that KataLeuna and CMP are citizens of different countries, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3. Venue is proper in this district and this division under 28 U.S.C. § 1391.

4. The TTA is an unambiguous agreement between KataLeuna and CMP. *Id.* at 531–32.

5. The TTA became effective on October 27, 1995. *Id.* at 526.

6. Under the TTA, CMP transferred, sold and assigned all rights, title and interest in, *inter alia,* certain FCC additives identified as SOx A, Combustion Promoter B and Octane B to KataLeuna. *Kat. Exh. 80* at ¶ 1(n).

7. Under ¶ 4(b)(6) of the TTA, CMP represented and warranted that "all statements and oaths made in the CMP Patent Applications shall be deemed to have been made to [KataLeuna] and [KataLeuna] shall be entitled to rely upon them as if made directly to [KataLeuna]." *Kat. Exh. 80* at ¶ 4(b)(6).

8. Under the TTA, CMP represented and warranted to KataLeuna that SOx A is a zinc titanate based sulfur oxide removing additive that effectively removes sulfur from FCC unit emissions. *Kat. Exh. 80* at ¶ 4(b)(6); *Kat. Exh. 86* at 3, 7, 8.

9. CMP breached ¶ 4(b)(6) of the TTA because CMP's formulation for a zinc titanate SOx additive *is not effective* in reducing the emissions of sulfur compounds from FCC units by capturing SOx and releasing the captured sulfur as H2S. *Kat. Exh. 80* at ¶ 4(b)(6).

10. Further, as compared to the industry standard additive, DeSox, CMP's formulation for a zinc titanate SOx additive provides minimal functionality in capturing SOx and releasing H2S. *See supra* findings 110, 114–16, 119, 146–54.

11. Under the TTA, CMP represented and warranted to KataLeuna that Combustion Promoter B was a "non-noble metal additive ... for catalyzing the conversion of carbon monoxide to carbon dioxide in the regenerator of an FCC unit ...with the same efficiency as a noble metal additive in converting the carbon monoxide into carbon dioxide." *Kat. Exh. 87* at 2.

12. CMP breached ¶ 4(b)(6) of the TTA because the Combustion Promoter B technology does not have the same efficiency as the industry standard benchmark (noble metal (platinum) based combustion promoter additive) in converting carbon monoxide to carbon dioxide. *See supra* findings 256–57, 269–71, 306–16.

13. CMP represented and warranted to KataLeuna that Combustion Promoter B is an FCC additive and process for making the same for "promoting the combustion of carbon monoxide to carbon dioxide in the regeneration of a fluid cracking catalyst." *Kat. Exh. 87* at 1.

14. CMP breached ¶ 4(b)(6) of the TTA because the Combustion Promoter B technology is not useful for catalyzing the conversion of carbon monoxide to carbon dioxide in the regenerator of an FCC unit. *See supra* findings 256–57, 269–71, 306–16.

15. CMP represented and warranted to KataLeuna in ¶ 4(b)(6) of the TTA that "[t]o the best of [CMP's] 'knowledge, all information contained in the CMP Patent Applications is true, complete and correct and contains no errors or omissions as filed.'" *Kat. Exh. 80* at 6.

16. Prior to the execution of the TTA, CMP and Dr. Albers possessed knowledge that SOx A, did not capture SOx and was not effective at promoting the removal of sulfur from an FCC unit. *See supra* findings 127–35.

17. CMP breached the representation and warranty to KataLeuna in ¶ 4(b)(6) of the TTA because CMP and Dr. Albers knew that SOx A was not effective at promoting the removal of sulfur from an FCC unit. *Id.*

18. CMP represented and warranted to KataLeuna that it had not "disclosed any part of the Technology to third parties and the Technology remains secret in all respects, whether or not such disclosure

would or could adversely affect Seller's right to obtain a patent therefor, except pursuant to confidentiality agreements." *Kat. Exh. 80* at ¶ 4(b)(10).

19. CMP breached the representation and warranty to KataLeuna in ¶ 4(b)(10) of the TTA because it had disclosed the SOx A technology to RTI and Dr. Gupta in 1994; the SOx A technology, therefore, was not "secret in all respects." *See supra* findings 101–26, 129–35, 326–37.

20. Under the TTA, CMP represented and warranted to KataLeuna that "[t]o the best of its knowledge, the Technology is new, useful and unobvious." *Kat. Exh. 80* at ¶ 4(b)(13).

21. Under the TTA, CMP also represented and warranted that the applications contained in the SOx A patent application for zinc titanate in the coal gasification process, which uses a fluidized or ebullating bed of catalyst to remove H2S (hydrogen sulfide), as opposed to a conventional regenerator, was new and unobvious. *See Kat. Exh. 80* at ¶ 4(b)(13); *see also Kat. Exh. 86.*

22. Prior to the execution of the TTA, Dr. Albers and CMP knew that RTI and Dr. Gupta had developed a zinc titanate technology and already had a patent application pending for zinc titanate additives in fluidized and ebullating beds. *See supra* findings 129–35, 326–37.

23. Also prior to the execution of the TTA, CMP and Dr. Albers had been involved with and knew that RTI and Dr. Gupta had a patent application that they were prosecuting for zinc titanate technology in the coal gasification process utilizing a fluidized or ebullating bed of catalyst to remove H2S. *Id.; Kat. Exh. 302* (Gupta Patent).

24. Thus, CMP breached the representation in ¶ 4(b)(13) of the TTA, because it knew that the claim in the SOx A patent application regarding an application for zinc titanate in the coal gasification process, utilizing a fluidized or ebullating bed of catalyst to remove H2S was neither new nor unobvious. *See Kat. Exh. 87* (SOx A Patent Application), *302* (Gupta Patent).

25. CMP granted KataLeuna a right of first refusal with respect to all of its rights existing after the execution of the TTA, including any patents to make, use or sell all sulfur oxide pollution control additives, without any additional consideration to CMP. *Kat. Exh. 80* at ¶ 18(b).

26. CMP breached ¶ 18(b) of the TTA because it never offered KataLeuna the rights to either U.S. Patent Nos. 5,928,496 (*Kat. Exh. 328*) or No. 6,156,696 (*Kat. Exh. 327*) for the hydrotalcite based SOx pollution control additive that CMP obtained after the TTA was consummated. *See supra* fact nos. 406–10.

27. Based on the representation and warranties made in the TTA by CMP about Octane B, KataLeuna believed it was purchasing an octane enhancer that was new and unobvious and, therefore, could be patented. *Kat. Exh. 80* at ¶¶ 1(n), 4(b)(6) and (13).

28. In fact, Octane B was neither new nor unobvious and could not be patented due to an existing South African patent. *See supra* findings 377–81, 384–98.

29. Octane B had no value. *Id.*

30. The TTA contained implied warranties of suitability, fitness, merchantability, and good faith that the technologies transferred from CMP to KataLeuna could work in a commercially reasonable and viable manner. *See* MD. CODE ANN.,

COM. LAW I §§ 2–314 [13] and 2–315 [14] (2002); *Twombley v. Fuller Brush Co.*, 221 Md. 476, 158 A.2d 110, 116–17 (1960) (discussing implied warranty of fitness and merchantability with regard to spot remover product that caused hepatitis when used and remanding case for new trial); *Pratt v. Weeks*, 1 F.Supp. 953, 957–58 (S.D.Fla.1932) (awarding recision of contract because gas mileage enhancer apparatus was unsuccessful and without value where defendant withheld critical information concerning its development and breached the contract).

31. CMP breached these implied warranties because the Combustion Promoter B and the Sox A technologies did not work in a commercially reasonable or viable manner. *See supra* fact nos. 110, 114–16, 119, 146–54 (SOx A), 256–57, 269–71, 306–16 (Combustion Promoter B).

■ 32. Rescission is appropriate when there is a substantial breach of a contract that destroys the main object of that agreement. *Plitt v. McMillan*, 244 Md. 450, 223 A.2d 772, 774 (1966) (contract is void where property was conveyed along with an application for membership to a beach club that was never formed).

33. Since the beach club formation and ensuing membership in *Plitt* was a "valuable right" that went to the heart of the contract, its failure to materialize was "a material breach of [the] contract by one party," entitling the purchaser to rescission. *Id.* ("[W]e think it is evident that the failure of the original seller . . . to provide the beach area contemplated by the contract of sale constituted such nonperformance or breach as entitled the purchaser to rescind the contract and to refuse to pay for the [property].")

■ 34. Similarly, the object of the TTA was the transfer of effective, commercially useful and viable, and patentable FCC additive technology, including SOx A, Combustion Promoter B and the Octane Enhancer, and to transfer all future rights in similar FCC additive technology. *Kat. Exh.* 80 at ¶¶ 1(n), 4(b)(6), (9)-(11), (13), and 18(b); *Kat. Exhs. 85, 86, 87.*

35. KataLeuna relied on CMP's representations and warranties in the TTA regarding SOx A, Combustion Promoter B, and the Octane B, that the technology was transferred as represented under the TTA (including the patent applications for each, which were incorporated by reference). *Id.*

36. Since the SOx A, Combustion Promoter B, and Octane Enhancer technology were not as represented in the TTA and the corresponding patent applications, the SOx B concept was never developed into any real technology, and the hydrotal-

---

**13.** Section 2–314, Implied Warranty; Merchantability; Usage of Trade, states in part:

(1) . . . a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind . . .
(a) In §§ 2–314 through 2–318 of this title, "seller" includes the manufacturer, distributor, dealer, wholesaler or other middleman or the retailer; and
(b) Any previous requirement of privity is abolished as between the buyer and the seller in any action brought by the buyer.
(2) Goods to be merchantable must be at least such as

(a) Pass without objection in the trade under the contract description; and
(b) In the case of fungible goods, are of fair average quality within the description; and
(c) Are fit for the ordinary purposes for which such goods are used . . . .

**14.** Section 2–315, Implied Warranty; Fitness for Particular Use, states in part:
(1) Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

cite SOx patents were never offered to KataLeuna, the essence of the TTA was destroyed and KataLeuna received nothing of value.

37.     CMP's material and substantial breaches of the representations and warranties contained in the TTA go to the root of the TTA and defeat its primary objective. *Plitt,* 223 A.2d at 774.

38.     Because there are material and substantial breaches of the TTA, the equitable remedy of rescission is available to KataLeuna. *See Washington Homes, Inc. v. Interstate Land Dev. Co.,* 281 Md. 712, 382 A.2d 555, 562–63 (1978) (recision upheld where material breach of contract for the sale of residential lots to housing developer was found because defendant/appellant refused to pay and plaintiff/appellee refused to convey the lots); *Funger v. Mayor & Council of Somerset,* 244 Md. 141, 223 A.2d 168, 173–75 (1966) (finding recision is warranted where there is a breach of a property contract and recognizing that "perfect restoration" to the pre-contractual position is not always possible or required); *Plitt,* 223 A.2d at 774.

39.     Granting rescission and returning the parties substantially to the *status quo ante* lies comfortably within the equity jurisdiction of this court in its application of Maryland law. *Id.*

■ 40.   It is well-settled in Maryland that rescission is a purely equitable remedy. *Mattingly v. Mattingly,* 92 Md.App. 248, 607 A.2d 575, 580–81 (1992) (citing *Creamer v. Helferstay,* 294 Md. 107, 448 A.2d 332, 335–36 (1982)).

■ 41.   In returning the parties to their pre-contractual position, the court may also grant restitutionary damages within its equitable powers. *See Mattingly,* 607 A.2d at 580–81 (no right to jury trial where relief requested (recision) is purely equitable; also recognizing that "restitutionary" damages that are "incidental or intertwined" with equitable relief may be granted) (quoting *Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry,* 494 U.S. 558, 570–71, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990)).

42.     KataLeuna is willing and able to return CMP to its position status quo ante. *See Washington Homes, Inc.,* 382 A.2d at 563 (stating " 'that one who seeks to rescind a contract or to have equity rescind it must restore to the other party the consideration that was given by that party . . . .' ") (quoting *Funger,* 223 A.2d at 173).

■ 43.   Return of the parties to their pre-contractual positions is not an absolute prerequisite to the equitable remedy of rescission. *See Funger,* 223 A.2d at 173–74 (finding complete restoration to pre-contractual position impossible in recision claim where town citizen plaintiffs are unable to undo a property zoning determination made by public officials and not initially opposed by defendants); Restatement (Second) of Contracts § 384(a) (1981) and cmts. b, c (also stating that an offer to return or actual return of property at issue is not a requirement antecedent to seeking recision).

44.     Indeed, "where on the particular facts it seems equitable to allow rescission without complete or perfect restoration of consideration, the modern tendency is to allow the relief." *Funger,* 223 A.2d at 173.

■ 45.   Therefore, "where the consideration [received] is without value," *id.* at 174 (citing *Gaver v. Gaver,* 176 Md. 171, 4 A.2d 132, 140 (1939)), or is "worthless . . . as a result of its own defects," Restatement (Second) of Contracts § 384(a), there is no requirement to restore it to the breaching party.

46.     Likewise, the patent applications and technology transferred to KataLeuna

by CMP under the TTA were represented to be FCC additives with value to Kata-Leuna. *Kat. Exh. 80* at ¶¶ 1(n), 4(b)(6), (9), (13); *Kat. Exhs. 85, 57; CMP Exh. 86.*

47. In fact, however, none of the patent applications or technology transferred to KataLeuna under the TTA *were as represented* in the TTA (or in the patent applications that were incorporated by reference) and, as a result, KataLeuna received FCC additives technology of no value.

■ 48. Since the consideration received by KataLeuna was of no value, return of these technologies is not a necessary prerequisite to this court granting rescission. *Funger*, 223 A.2d at 174; Restatement (Second) of Contracts § 384.

49. Nonetheless, KataLeuna is ready, willing and able to return the SOx A, Combustion Promoter B, and Octane Enhancer technologies, as well as any patents obtained thereon, to CMP. *See supra* findings 442–443.

■ 50. In the exercise of a fully informed equitable discretion based on the above findings, I conclude that KataLeuna is entitled to be returned to its position *status quo ante. See Merritt v. Craig*, 130 Md.App. 350, 746 A.2d 923, 931 (2000) (stating that rescinding party has right to "retain the contract and collect damages for its breach, or a right to rescind the contract and recover his or her own expenditures," but not both, and "must demonstrate that he [or she] acted promptly after discovery of the ground for rescission") (quoting *Lazorcak v. Feuerstein*, 273 Md. 69, 327 A.2d 477, 481 (1974); *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 469 A.2d 867, 893–94 (1984)).

51. KataLeuna is entitled to the return of the $2.1 million paid as direct consideration for the TTA. *Tr.* at 84–85;

*Kat. Exh. 80*, ¶ 2(b) and (c); *see supra* findings 64, 425–28.

52. KataLeuna is entitled to the return of the 5,000 shares of TII stock. *Id.*

53. In order to be restored to its pre-contractual position, KataLeuna also is entitled to restitutionary damages on its equitable claim for rescission. *See Mattingly*, 607 A.2d at 580–81.

54. Restitutionary damages are appropriate if they are incidental and intertwined with the equitable relief sought (rescission) in this case. *See id; see also Terry*, 494 U.S. at 570–71, 110 S.Ct. 1339.

55. The court, sitting in equity, has the power to grant this remedy as part of its "equitable 'clean-up' powers." *See Merritt*, 746 A.2d at 930.

56. Once an equity court has jurisdiction, it may grant monetary damages because it has the "authority to fashion" and administer, as it sees fit, a remedy that will provide "complete relief" so long as the "remedies sought by [plaintiff] are cumulative and consistent." *See Shoreham Developers, Inc. v. Randolph Hills, Inc.*, 269 Md. 291, 305 A.2d 465, 472 (1973); *Hardisty v. Kay*, 268 Md. 202, 299 A.2d 771, 775–76 (1973).

57. KataLeuna has demonstrated through the trial testimony of McDaniel and Rosenthal, and *Kat. Exh. 73–A* and the documents related thereto, that Kata-Leuna spent $1,193,449.13 in pursuing the commercial development of the technology it received from CMP under the TTA, a pursuit that, as CMP knew or but for its reckless disregard of the warranties spelled out in the TTA would have known, was doomed to failure. *See supra* findings 429–434.

58. This amount is above and beyond the $2,100,000 paid to CMP under the TTA, is intertwined with the remedy of rescission, and is thus awardable *in part* to

KataLeuna as equitable damages that are intertwined with its remedy of rescission. *Id.*

59. I conclude that, although it was foreseeable that McDaniel would pursue with "vigor" and "wholehearted[ly]" the technology's potential commercial value, KataLeuna and McDaniel had a duty to exercise reasonable business judgment in the absence of substantial antecedent formal "due diligence" and investigation in KataLeuna's purchase of the technology, and also because some funds would have been expended for such an examination, that some adjustment is appropriate in the restitution awarded to KataLeuna.

60. Accordingly, I conclude that KataLeuna's recovery should be reduced by $500,000 as a reasonable estimate of KataLeuna's unavoidable losses even had it expended funds to investigate whether the deal was worthwhile.

61. KataLeuna is entitled to an order declaring the TTA is null, void, and rescinded, and no longer in force or effect, and to restitution in the amount of $2,793,449.13, with pre-judgment interest from the date of the filing of KataLeuna's counterclaim for recision.

62. KataLeuna is entitled to an order declaring that its officers, directors, employees, agents, representatives, attorneys and its and their successors and assigns shall have no further obligations to CMP, or any other person or entity under any of the provisions of the TTA.

63. CMP is entitled to an order declaring that it shall have no further obligations to KataLeuna or any other person or entity under any of the provisions of the TTA.

\*    \*    \*    \*    \*    \*

I shall confer promptly with counsel with an eye to fashioning an appropriate order by which to effectuate the findings and conclusions set forth above. In the meantime, by order entered herewith, and consonant with the findings and conclusions set forth herein, I shall finally determine all outstanding requests for pre-trial and post-trial relief previously submitted by the parties.